**LaSalle National Insurance Company, Plaintiff-Appellee, v. Executive Auto Leasing Company, and Arthur Malkin, Defendants-Appellants.**

Gen. No. 53,916.

First District, Third Division.

March 19, 1970.

Rehearing denied April 23, 1970.

Mayer, Friedlich, Spiess, Tierney, Brown & Platt, of Chicago (George W. Hamman and Neil G. Bluhm, of counsel), for appellants.

Charles N. Salzman, Sheldon Karon, and Laurance P. Nathan, of Chicago (Friedman, Koven, Shapiro, Salzman, Koenigsberg, Specks & Homer, of counsel), for appellee.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

The defendant, Executive Auto Leasing Co., appeals from a summary judgment entered for the plaintiff, La Salle National Insurance Company, in a declaratory judgment action for the interpretation of a fleet automobile insurance policy. The trial court entered judgment in favor of the plaintiff for $121,104.39, the amount alleged due under the retrospective premium endorsement of the policy. Executive contends that the pleadings,

admissions and affidavits raised genuine issues of material fact which required determination by a jury.

In September 1962, Executive and LaSalle entered into a three-year contract whereby LaSalle insured against liability for bodily injury, property damage and medical payments those lessees of Executive who chose to receive its coverage. The policy was retrospective, i. e., one in which the premium was to be based upon the insurer's loss experience during the entire term of the policy. The retrospective premium due to LaSalle was to be determined by multiplying the amount of the incurred losses by the factor of 1.4556. The contract incorporated maximum and minimum amounts of annual earned premiums which were to be based on Executive's gross receipts. In the event that LaSalle's loss experience was higher than estimated, a maximum of 6.844% was to be paid; conversely, there was to be a minimum annual premium equal to 4.526% of gross receipts. Since the actual amount of the earned premium was not to be determined until the expiration of the policy period, the policy made provision for Executive to make annual payments to LaSalle, again based on a percentage of gross receipts. These payments were to be applied against the final amount of the earned premium which would be calculated after the expiration of the policy.

Executive paid the standard premium each year for the life of the policy; LaSalle audited the accounts each year. In September 1967, LaSalle filed an adjusted premium statement indicating that $121,104.39 was due from Executive. This computation showed a retrospective premium which exceeded the maximum earned premium, as based on the percentage of Executive's gross receipts. Based on the maximum allowable percentage, the earned premium was determined to be $407,479.71. After giving credit for payments previously made by Executive during the policy term, LaSalle determined that the premium balance was $121,104.39.

LaSalle's complaint alleged the above facts and also claimed that the amount of gross receipts should be equal to the aggregate rentals received by Executive under the lease agreements for which LaSalle provided insurance. The complaint averred that Executive had wrongly excluded from the gross receipts a certain portion of these rentals, thereby depriving LaSalle of the full premium due. LaSalle sought a construction of the policy and a determination that Executive was liable for the unpaid premium balance.

In its answer, Executive denied that LaSalle's incurred losses were as high as LaSalle asserted and it asked that the trial court determine the actual incurred losses for each calendar year of the policy. The answer alleged that the term "gross receipts," as defined in the policy, did not include those sums received by Executive for such items as the maintenance of the leased autos, their license fees and insurance premiums. Executive also claimed that the premium was to be based on a calendar-year basis rather than on a three-year term as urged by the plaintiff. LaSalle's reply denied the affirmative allegations set forth in the answer.

In answer to LaSalle's interrogatories, Executive confirmed that its gross receipts from insured lessees was $5,953,823.90 and that from this income it deducted an arbitrary sum for reimbursable expenses. These expenses were various items that its lessees had the option of either providing for themselves or obtaining through Executive on a cost basis. In order to arrive at the net receipts reportable to LaSalle, Executive deducted from the annual amount of gross income received from its insured lessees the sum of $360,000 per year for the first two years of the policy and the sum of $240,000 for the third year.

Executive filed a motion for the production of documents relating to LaSalle's incurred losses, and LaSalle filed one for summary judgment supported by an affi-

davit from its treasurer. Executive filed objections to LaSalle's motion and an affidavit from one of its partners. The affidavit and the objections described the negotiations surrounding the issuance of the policy and the interpretation placed on the term "gross receipts" by the parties. Executive presented a motion for leave to amend its answer on the day the summary judgment was entered. The amendment contended that LaSalle was estopped from raising the issue of gross receipts since Executive had acted in reliance on LaSalle's assurances that the premium was to be based on funds received for the leasing of automobiles and not on funds received for reimbursable expenses. The record is not clear whether the motion to amend was granted.

██ The purpose of the summary judgment procedure is to determine whether there exists a genuine issue of material fact. If there is no such issue the moving party is entitled to summary judgment as a matter of law. If there is such an issue, summary judgment must be denied. The right to summary judgment must be free from doubt. Ill Rev Stats 1967, c 110, sec 57; Anderson v. Prab Conveyers, Inc., 69 Ill App2d 224, 216 NE2d 252 (1966). Executive contends that genuine issues of material fact exist regarding the amount of incurred losses and the definition of the term "gross receipts," both of which require that the summary judgment granted by the trial court be reversed.

The insurance policy defined "incurred losses" to include losses paid by the plaintiff LaSalle, reserves for losses not yet paid, and certain administrative expenses. LaSalle's premium statement and complaint stated that it had incurred losses of $320,818.81; this figure when multiplied by the factor of 1.4556 resulted in an earned premium of $466,056.64. Executive denied that the incurred loss figure was correct. It requested the production of documents relating to the claimed loss and

the reserves therefor. LaSalle had no objection to producing these documents, but the court never ruled upon Executive's motion.

■ LaSalle placed the amount of incurred losses in dispute in its pleadings. Though the amount of paid-out claims is a matter of accounting, an item such as reserves for unliquidated losses involves an exercise of discretion. Supreme Court Rule 201, provides that "a party may obtain by discovery full disclosure regarding any matter relevant to the subject matter involved in the pending litigation." Ill Rev Stats 1967, c 110A, § 201. LaSalle has the exclusive control over information regarding the claims made and the amounts sought, as well as a superior opportunity to ascertain their value and the reserves required for them. Premiums due under the policy are initially measured by the amount of incurred losses; thus, the determination of these losses established Executive's threshold liability to LaSalle. Good cause existed for the production of the documents before summary judgment was granted in order that Executive could determine the factual basis for LaSalle's assertion that its incurred losses were $320,818.81. The factual issue over the size of the losses might have disappeared if the pertinent documents had been produced; but they were not and the issue was unresolved when the judgment was entered.

An issue of even greater materiality concerned Executive's gross receipts. The alternative method of determining the premium—which came into play because of the size of the incurred losses—was founded on a percentage of the gross receipts. Under the circumstances, the receipts were subject to 6.844%, the maximum percentage permitted by the policy. Gross receipts was defined in the policy as:

". . . the total amount the named insured is entitled to receive for the leasing of automobiles un-

der lease agreements requiring the named insured to provide the insurance coverage afforded by this policy."

Executive points to the phrase "for the leasing of automobiles" and contends that it modifies the words which precede it: "the total amount the named insured is entitled to receive." It submits that when this is done it becomes clear that only income received from leasing automobiles was intended to be included in gross receipts, and that additional sums received from the lessees for such items as state and municipal auto licenses, automobile insurance and the maintenance of the leased autos are not embraced within the term "gross receipts." La Salle contends that the phrase "for the leasing of automobiles" must be read in conjunction with the words which follow it: "under lease agreements requiring the named insured to provide the insurance coverage afforded by this policy." It submits that when this is done it becomes clear that the phrase was intended to differentiate between leasing agreements which provided insurance coverage and those which did not, and thus "gross receipts" includes the aggregate sums received from the insured lessees before any deductions are taken. The trial court gave additional reasons for agreeing with LaSalle's position. The court stated that the premiums were based on gross receipts, and that gross receipts—as defined in Webster's Dictionary, Black's Law Dictionary, 4th Edition, and in certain cases—meant total receipts before any expenditures were made. The court said that if the parties had intended to give the term a different meaning they should have spelled it out in their policy.

In support of its position LaSalle quotes from Sheriff v. Moore, 105 Ga App 833, 125 SE2d 729 (1962):

" 'Gross receipts' as used in an insurance policy in providing a method of determining the premium to

be paid, is not an ambiguous term. The words mean the whole, entire, total receipts, as opposed to 'net receipts.' . . . and under ordinary basis method of handling accounts the term must be taken to include the whole total gross receipts without any deductions."

There is no indication in Sheriff that the insurance policy in that case defined the term "gross receipts" as it was defined in the present policy. Nor is State v. Illinois Central R. Co., 246 Ill 188, 92 NE 814 (1910), a tax case which LaSalle cites, apposite here. When a tax is levied on gross receipts it applies to every penny a person, firm or corporation takes in regardless of the source whence it comes. In the present case the parties attempted to give their own definition to gross receipts. The policy must be construed, therefore, in accordance with their understanding of the term.

■ ■ It indeed would have been well, as the trial court said, if the parties had spelled out precisely what they meant by gross receipts. As it is, their contractual definition is susceptible of either LaSalle's or Executive's construction. A contract is ambiguous if the words used by the parties are fairly susceptible of being understood in more than one sense. Coney v. Rockford Life Ins. Co., 67 Ill App2d 395, 214 NE2d 1 (1966). In the construction of a contract the determining factor is the intention of the parties. If possible, the intention must be ascertained from the language employed in the contract (Industrial Commodity Corp. v. E. J. Brach & Sons, 92 Ill App2d 163, 235 NE2d 857 (1968)) but if this is impossible, the language may be explained by extrinsic evidence so that the true intention of the parties may be learned. Martindell v. Lake Shore Nat. Bank, 15 Ill2d 272, 154 NE2d 683 (1958).

■ The present policy requires extrinsic evidence to ascertain the intent of the parties at the time they en-

tered into it. Admissible facts and circumstances surrounding the making of the contract, the interpretation placed upon it by the parties contemporaneously with its making or by their performance under its terms, acts by one party which may have indicated acceptance of the other's interpretation, may aid the court or jury in reaching the correct construction. The ambiguity of the policy created a genuine issue of material fact.

Two additional points are raised by Executive: (1) that the premium should have been computed for each year of the policy rather than at its expiration, and (2) that LaSalle is estopped from computing the premium—two years after the policy ended—on the basis of its own interpretation of gross receipts. As to the first, Executive says it is entitled to judgment as a matter of law and as to the second, that it is entitled to a trial.

■ As this opinion has pointed out, the three-year policy provided for a retrospective premium upon the policy's expiration. This was for the purpose of enabling the insurer to determine its incurred losses with finality and to adjust the final premium in relation to the fixed monthly and minimum annual premiums paid during the life of the policy. The trial court correctly ruled that a computation based on the whole period of the policy was proper.

■ Executive's amended answer raised the defense of estoppel. The defense must be considered in connection with an affidavit submitted by Executive which stated that under a prior policy with another insurance company it had paid a premium based on leasing income only; that LaSalle was informed of this and copied the prior policy's definition of gross receipts into its policy, and that during the life of the LaSalle policy Executive operated just as it had under the prior policy without objection by LaSalle. On appeal, LaSalle responds that such extrinsic evidence would violate the parol evi-

dence rule and is not admissible where a contract is complete and unambiguous. We have found, however, that the policy is ambiguous and that appropriate extrinsic evidence may be received to clarify the ambiguity. The amended answer raised a material factual issue which also entitled Executive to a trial. However, as we mentioned earlier, it is not clear whether the motion to amend was allowed. This question can be resolved on remand.

The insurance policy, the pleadings of the parties and their affidavits raised the factual issues of incurred losses, the meaning of gross receipts, and estoppel. Summary judgment should not have been granted. The judgment is reversed and the cause remanded.

Reversed and remanded.

SCHWARTZ and McNAMARA, JJ., concur.