922 F.2d 357
 20 Fed.R.Serv.3d 526
 HARBOR INSURANCE COMPANY and Allstate Insurance Company,
Plaintiffs-Appellees-Cross-Appellants,
v.
CONTINENTAL BANK CORPORATION, formerly known as Continental
Illinois Corporation; and Continental Bank N.A., formerly
known as Continental Illinois National Bank and Trust
Company of Chicago, Defendants-Appellants-Cross-Appellees.
 Nos. 90-1044, 90-1090.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 12, 1990.
Decided Dec. 17, 1990.
As Amended Dec. 20, 1990.
Rehearing Denied Jan. 29, 1991.
 
 A. Benjamin Goldgar, Dennis C. Waldon, James G. Heiring, Frank J. Roan, Keck, Mahin & Cate, Thomas D. Allen, Kathy P. Saxton, Jane A. Zimmerman, Wildman, Harrold, Allen & Dixon, Sara E. Cook, James P. DeNardo, McKenna, Storer, Rowe, White & Farrug, Thomas W. Conklin, Linda E. Unger, Conklin & Roadhouse, Chicago, Ill., for plaintiffs-appellees-cross-appellants.
 Thomas P. Healy, Jr., Michele Odorizzi, Roger W. Barrett, Franklin P. Auwarter, Robert J. Kriss, Mayer, Brown & Platt, Leonard Ring, Debra A. Thomas, Ring & Associates, Chicago, Ill., for defendants-appellants-cross-appellees.
 Before WOOD, Jr., POSNER, and FLAUM, Circuit Judges.
 POSNER, Circuit Judge.
 
 
 1
 This suit involves the interpretation of an insurance policy for directors' and officers' liability issued by Harbor and Allstate to Continental Bank. The policy provides that if Continental sustains a loss as a result of a claim made against a director or officer for wrongful acts committed in the performance of his office, Harbor shall reimburse Continental Bank for the first $15 million of loss and Allstate shall reimburse it for the next $10 million. There is another condition: the claim must be one with respect to which Continental, under its charter, is required or permitted to indemnify a director or officer. We go to the charter and find that it permits Continental to indemnify any person "who was or is a party or is threatened to be made a party to any threatened, pending or completed action ... by reason of the fact that he is or was a director [or] officer ... against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, ... if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation."
 
 
 2
 The claims at issue in this case were made in the wake of the collapse of the Penn Square bank, from which Continental had bought $1 billion in loans, most of which proved to be uncollectible. Continental itself collapsed, and although it was saved at the last minute by the Federal Deposit Insurance Corporation its stock became virtually worthless, precipitating a flurry of lawsuits by investors who had bought the stock just before the collapse. National Union Fire Ins. Co. v. Continental Illinois Corp., 666 F.Supp. 1180, 1184 (N.D. Ill.1987). The suits charged securities fraud--specifically, that Continental had concealed the bad news about the Penn Square loans in order to keep up the price of its stock. Two of the suits are germane to this appeal. One, certified early on as a class action, named as defendants Continental plus twenty-five directors, officers, and employees of Continental identified only as "John Does." The other suit named as defendants Continental and five of its directors, identified by their proper names.
 
 
 3
 While the two suits were wending their way through the courts, Harbor and Allstate brought this suit against Continental for a declaration that they were not liable under the directors' and officers' policy. The reason given in the complaint was that the behavior of the directors had been so egregious that, even in the unlikely event that such conduct could be fitted within the good-faith proviso in Continental's charter, federal and state law would forbid Continental to indemnify the directors for any liability they incurred as a result of that conduct. Id. at 1186-91. The FDIC was named as an additional defendant because it controlled Continental at the time the suit was brought. The propriety of naming the FDIC as a defendant is not in question; and by doing so the plaintiffs obtained federal jurisdiction over Continental, 12 U.S.C. Sec. 1819(b)(2)(A); FDIC v. W.R. Grace & Co., 877 F.2d 614, 617 (7th Cir.1989), even though complete diversity of citizenship is lacking because Allstate and Continental are both citizens of Illinois.
 
 
 4
 A year after the filing of this suit, Continental settled the two securities cases for $17.5 million and then filed a counterclaim against Harbor and Allstate seeking reimbursement of $15 million from Harbor and the remaining $2.5 million from Allstate (the excess insurer). Harbor and Allstate now changed their tune. No longer did they argue that the directors' conduct had been so egregious as to make indemnification by Continental offensive to public policy. They argued that Continental had settled the cases prematurely; the directors had been guilty of no misconduct at all! The counterclaim was tried, resulting in a judgment for the insurance companies of nonliability from which Continental appeals. There is a cross-appeal which we shall take up at the end. The parties agree that Illinois law governs all substantive issues in both appeals.
 
 
 5
 We must first consider whether the district court had jurisdiction over the counterclaim insofar as it named Allstate as a defendant along with Harbor. The suit for declaratory judgment brought by the two insurance companies against Continental and the FDIC was within federal jurisdiction by virtue of the FDIC's being a party to the case. So if Continental's counterclaim against Allstate had been a compulsory counterclaim, it would not have needed an independent federal jurisdictional basis; it would have been within the district court's ancillary jurisdiction. Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974). The counterclaim against Harbor had an independent federal jurisdictional basis--diversity of citizenship. (Well, not quite, because the counterclaim was against Allstate as well as Harbor. However, after Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989), a want of complete diversity can be cured by the dismissal of the nondiverse party even on appeal.) But insofar as the counterclaim was directed against Allstate, it did not have an independent federal jurisdictional basis, and it was not compulsory because it had not existed when the main suit was filed. The authority for filing the counterclaim (against Harbor as well as Allstate) was Rule 13(e) of the Federal Rules of Civil Procedure, which provides that "a claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by a supplemental pleading." (The court gave its permission.) A counterclaim founded on Rule 13(e), Allstate argues, is permissive; a permissive counterclaim requires an independent federal jurisdictional basis, Hartford Accident & Indemnity Co. v. Sullivan, 846 F.2d 377, 381 (7th Cir.1988); therefore Allstate, although not Harbor, should be dismissed.
 
 
 6
 The major premise is incorrect. The word "permission" in Rule 13(e) should not be equated to "permissive" in Rule 13(b). Rule 13(a) defines a compulsory counterclaim as one that "arises out of the same transaction or occurrence that is the subject matter of" the complaint. Rule 13(b) defines a permissive counterclaim as one that does not arise out of the same transaction or occurrence that is the subject matter of the complaint. Continental's counterclaim against Allstate arises out of the same transaction as the declaratory judgment complaint filed by Harbor and Allstate, and the only reason it is not a Rule 13(a) counterclaim is that it did not exist when the complaint was filed. This is an excellent, indeed compelling, reason; it just is not a reason that has anything to do with Rule 13(e).
 
 
 7
 A compulsory counterclaim is compulsory; unless set forth in the answer to the complaint it is waived. Fed.R.Civ.P. 7(a), 12(a), (b); Baker v. Gold Seal Liquors, Inc., supra, 417 U.S. at 469 n. 1, 94 S.Ct. at 2506 n. 1; Burlington Northern R.R. v. Strong, 907 F.2d 707, 710 (7th Cir.1990); Asset Allocation & Management Co. v. Western Employers Ins. Co., 892 F.2d 566, 572 (7th Cir.1989). It would be bizarre to attach this sanction to a counterclaim that could not have been filed with the answer because it did not exist when the answer was due. Rule 13(a) is therefore by its very terms confined to "claim[s] which at the time of serving the pleading the pleader has against any opposing party," normally the plaintiff. Rule 13(e) allows such claims, with the court's permission, to be added later. The reason that permission is required is that the course of the litigation may be unduly disrupted if new claims are belatedly injected; in that case permission will be denied and the defendant can bring his claim as an independent lawsuit.
 
 
 8
 Closely related claims should if possible be tried together to spare the parties and the American judicial system the diseconomies of multiple proceedings. That indeed is the premise of Rule 13(e). Continental's claim against Allstate is as closely related as it could be to Allstate's claim against Continental--as closely related as it would be if it were a compulsory counterclaim within the meaning of Rule 13(a). Every consideration of judicial economy that argues for ancillary jurisdiction over Rule 13(a) counterclaims--and those are the very considerations responsible for the doctrine of ancillary jurisdiction, which until a few weeks ago (see below) was not statutory--argues with equal force for ancillary jurisdiction over this Rule 13(e) counterclaim, although not over every one since some Rule 13(e) counterclaims are permissive in the 13(b) sense.
 
 
 9
 In holding that a Rule 13(e) counterclaim that arises out of the same transaction or occurrence as the complaint is within the ancillary jurisdiction of the federal courts, we find ourselves in respectful disagreement with the Fifth Circuit's decision in Young v. City of New Orleans, 751 F.2d 794, 801 (5th Cir.1985), the only other decision we have found in which the issue arose. The entire basis of the Fifth Circuit's decision on this point is, however, a misinterpretation of Wright and Miller's treatise. The court quotes accurately the statement in the treatise that "a counterclaim acquired by the defendant after he has answered will not be considered compulsory, even if it arises out of the same transaction as does the plaintiff's claim." 751 F.2d at 801, quoting 6 Wright & Miller, Federal Practice and Procedure 55 (1971) (now 6 Wright, Miller & Kane, Federal Practice and Procedure 81 (2d ed. 1990), except for the deletion of "the" before "defendant" and "plaintiff"). But all that the treatise's authors meant by this is that the after-acquired counterclaim is not forfeited merely because it had not been filed within the normal time for filing a counterclaim. In other words, they are talking about Rule 13(a). They are explicit that if the district judge, in the exercise of his powers under Rule 13(e), allows an after-acquired counterclaim to be filed, and the counterclaim arises out of the same transaction or occurrence as the complaint, "then it should be treated as if it were a compulsory counterclaim for jurisdictional purposes," i.e., for purposes of founding ancillary jurisdiction. Id. at 212 (p.151 of the 1971 edition). Young has never been cited for the proposition that after-acquired counterclaims are never within the ancillary jurisdiction of the federal courts. But since our decision creates a conflict between circuits, we have circulated it to all the judges of this court in active service. 7th Cir. R. 40(f). None of the judges has voted to hear the case en banc.
 
 
 10
 There might appear to be an alternative ground for retaining jurisdiction over Allstate: the doctrine of pendent party jurisdiction. The district court had jurisdiction over Continental's counterclaim against Harbor not only under ancillary jurisdiction, but also under diversity jurisdiction, and so it might appear to have jurisdiction over Allstate by virtue of pendent party jurisdiction. Not so. Even if some pendent party jurisdiction survived Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), we held years ago that there is no pendent party jurisdiction in diversity cases. Hixon v. Sherwin-Williams Co., 671 F.2d 1005 (7th Cir.1982).
 
 
 11
 Speaking of Finley, we are well aware that that decision is premised on a hostility to nonstatutory jurisdiction that may eventually sweep into history's dustbin not only whatever pendent party jurisdiction survives the holding of Finley but also pendent claim jurisdiction and ancillary jurisdiction. And we share the concern that underlies Finley with judges' creating their own jurisdiction. But unless and until the Supreme Court discards the doctrine of ancillary jurisdiction we are bound by it and by its logic, which embraces a Rule 13(e) counterclaim that arises out of the same transaction or occurrence as the complaint. It is true that after the argument in this case Congress passed a statute intended to overrule Finley and provide a statutory basis for pendent claim, pendent party, and ancillary jurisdiction (all renamed "supplemental jurisdiction"). Judicial Improvements Act of 1990, Sec. 310(a), 104 Stat. 5089, 28 U.S.C. Sec. 1367. Because the statute is inapplicable to cases brought before its effective date (December 1, 1990), Judicial Improvements Act of 1990, Sec. 310(b), it has no application to the present case and therefore the doubts that we have expressed about the continuing vitality of nonstatutory pendent and ancillary jurisdiction are not allayed.
 
 
 12
 We come at last to the merits. Continental cites a series of trial errors to which it attributes the zero verdict that it got from the jury. It places particular emphasis on the district judge's refusal to allow it to place in evidence a copy of the declaratory judgment complaint, in which the insurance companies had alleged that the directors had been guilty of egregiously wrongful acts--so wrongful as to bar Continental from indemnifying the directors, and by barring indemnity to bar Continental from obtaining any recovery under the insurance policy. Continental considered this telling evidence that the insurance companies' present position--that Continental had settled the cases precipitately, because the directors were innocent and therefore Continental was not exposed to derivative liability for their wrongdoing--was dishonest and unfounded. The judge, however, thought that the position which the insurance companies had taken in a pleading filed long before the counterclaim that was the subject of the trial was irrelevant to the issues at trial.
 
 
 13
 This ruling was incorrect in two respects. First, the complaint was the cornerstone of Continental's effort to establish the insurers' liability with the help of the doctrine of "mend the hold." Demonstrating a curious incuriosity about language, none of the lawyers was able to explain to us the meaning of this phrase, which at times indeed they made complete nonsense of--alas, with judicial authority, Townsend v. Postal Benefit Ass'n, 262 Ill.App. 483, 489 (1931)--by calling it "amend his hold." (The correct term, "mend," appears in id. at 488.) But they agree as they must that it is the name of a common law doctrine that limits the right of a party to a contract suit to change his litigating position. In fact the phrase is a nineteenth-century wrestling term, meaning to get a better grip (hold) on your opponent. The first case to use the term and spell out the doctrine was Railway Co. v. McCarthy, 96 U.S. 258, 6 Otto 258, 24 L.Ed. 693 (1877), although the essential features of the doctrine can be found in much earlier cases. Wright v. Reed, 3 D. & E. 554, 100 Eng. Rep. 729 (K.B. 1790); Gould v. Banks & Gould, 8 Wend. 561, 566 (S.Ct. of N.Y. 1832); Everett v. Saltus, 15 Wend. 474, 478 (S.Ct. of N.Y. 1836); Holbrook v. Wight, 24 Wend. 169, 180 (S.Ct. of N.Y. 1840). Railway Co. v. McCarthy was a suit on a contract. The defendant (the railroad) tried to prove that it could not make the shipment required by the contract because it lacked the necessary rail cars. After the close of the evidence, the railroad suggested for the first time that the reason it could not make the shipment was that to do so would have violated the state's Sunday-closing law. 96 U.S. at 260, 265, 267. The Court refused to consider this "after-thought," stating that "where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold." Id. at 267-68.
 
 
 14
 "Mend the hold" made its Illinois debut in Gibson v. Brown, 214 Ill. 330, 341, 73 N.E. 578, 582 (1905), another contract case, where the court used the doctrine as the basis for holding that "by placing his refusal to perform the contract on those grounds he waived all other contentions which he now makes as a reason why he should not perform the contract." To the same effect see County of Schuyler v. Missouri Bridge & Iron Co., 256 Ill. 348, 353, 100 N.E. 239, 240 (1912), the only other decision by the Supreme Court of Illinois to mention the doctrine by name, as it were.
 
 
 15
 The operation of the doctrine in Illinois is well illustrated by Larson v. Johnson, 1 Ill.App.2d 36, 116 N.E.2d 187 (1953), a thorough and learned opinion in (once again) a suit for breach of contract. The initial defense was that the contract had been induced by fraud. Later the defendant abandoned this defense in favor of a new one, that the contract was too indefinite to be enforced. The court refused to allow the substitution, quoting the passage we quoted above from Railway Co. v. McCarthy, 1 Ill.App.2d at 40, 116 N.E.2d at 189. In First Commodity Traders, Inc. v. Heinold Commodities, Inc., 766 F.2d 1007, 1013 (7th Cir.1985), we treated Larson as an authoritative exposition of Illinois law--fairly enough, since the only other modern cases in Illinois that discuss the doctrine describe and apply it similarly, and of the three decisions Larson contains the fullest discussion. Rural Electric Convenience Cooperative Co. v. Illinois Commerce Commission, 118 Ill.App.3d 647, 653-54, 73 Ill.Dec. 951, 955, 454 N.E.2d 1200, 1204 (1983); IK Corp. v. One Financial Place Partnership, 200 Ill.App.3d 802, 815, 146 Ill.Dec. 198, 211, 558 N.E.2d 161, 170 (1990).
 
 
 16
 The persistence of the doctrine, nineteenth-century phraseology and all, is not a peculiarity of Illinois jurisprudence. During the past decade alone, the phrase "mend the hold" has been mentioned in decisions by courts of eight other states. Sometimes it is treated as a pure principle of procedure, as in Butts v. Georgia Casualty & Surety Co., 179 Ga.App. 819, 821, 348 S.E.2d 94, 96 (1986)--but sometimes as a substantive doctrine especially applicable to insurance companies that change their reason for refusing to pay a claim, as in Hamlin v. Mutual Life Ins. Co., 145 Vt. 264, 268-69, 487 A.2d 159, 162 (1984), and Cornhusker Agricultural Ass'n, Inc. v. Equitable General Ins. Co., 223 Neb. 618, 628, 392 N.W.2d 366, 373 (1986).
 
 
 17
 Harbor and Allstate describe the "mend the hold" doctrine as "quirky." The name is quirky, but the doctrine itself, appropriately configured (an important qualification), can be seen as a corollary of the duty of good faith that the law of Illinois as of other states imposes on the parties to contracts. AMPAT/Midwest, Inc. v. Illinois Tool Works Inc., 896 F.2d 1035, 1041 (7th Cir.1990); Harrison v. Sears, Roebuck & Co., 189 Ill.App.3d 980, 991, 137 Ill.Dec. 494, 501, 546 N.E.2d 248, 255 (1989); 2 Farnsworth on Contracts Sec. 7.17, at pp. 310-13 (1990). A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith. Larson explicitly connects the "mend the hold" doctrine to considerations of good faith and ethical obligations in contract relations. 1 Ill.App.2d at 46, 116 N.E.2d at 191-92.
 
 
 18
 This interpretation is very damaging to the insurance companies in this case. In the declaratory judgment complaint Harbor and Allstate gave as their reason for not being liable to Continental for any losses that Continental might incur by virtue of the misconduct of its directors that their misconduct had been too egregious to permit Continental to indemnify them without violating federal and state law. Later in the same litigation, in defending against the counterclaim, the insurance companies changed course 180 degrees, arguing that the reason they were not liable to Continental was that the directors had never been shown to have committed any wrongful acts exposing them to liability. As Allstate puts it in its brief, "There was insufficient evidence that the individuals [the directors] engaged in any wrongdoing," and therefore the $17.5 million settlement "was not a reasonable settlement on behalf of the individual defendants." (Emphasis ours.) They defend their change of position principally on the ground that the allegations of misconduct in their complaint were copied from the complaints in the securities fraud suits against Continental without any attempt to verify the allegations. As Harbor says in its brief, "since insurers could not know what actually took place, they adopted portions of the complaints filed by the [plaintiffs in the securities-fraud actions] as allegations" in their complaint against Continental. Quite apart from the duties of precomplaint inquiry that Rule 11 of the Federal Rules of Civil Procedure imposes, one might suppose that the insurance companies owed their insured a fuller inquiry before denying liability on what proved to be an untenable ground.
 
 
 19
 The reach of the "mend the hold" doctrine is uncertain. The language of many of the cases, including those in the Illinois Appellate Court, such as Larson, is consistent with the view that the doctrine only bars a contract party from changing his position in litigation. So interpreted, the doctrine is a cousin to judicial estoppel, which forbids a party that has won an earlier suit to take an inconsistent position in a subsequent one. Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp., 910 F.2d 1540, 1547-48 (7th Cir.1990); Finley v. Kesling, 105 Ill.App.3d 1, 8-9, 60 Ill.Dec. 874, 880-81, 433 N.E.2d 1112, 1118-19 (1982). The present case is indeed one in which a party does his volte-face in litigation. But if "mend the hold" is viewed procedurally, as a rule somehow limited to litigation, it may cross the line that separates "substance" from "procedure"--state prerogatives in diversity cases from federal prerogatives in all cases in federal court, including diversity cases--by rigidifying the system of pleading that the Federal Rules of Civil Procedure seek to make supple. Those rules are designed not to freeze parties in the positions they take in their initial pleadings. The pleadings kick off a course of pretrial discovery expected to result in modifications in the parties' positions, which often do not crystallize until the filing of the final pretrial order, sometimes on the very eve of trial. Rule 8(e)(2) permits a party to state "as many separate claims or defenses as the party has regardless of consistency." The "mend the hold" doctrine, procedurally viewed, embodies an antithetical conception of the litigation process, one in which a party is expected to have all his pins in perfect order when he files his first pleading. This is particularly clear when the term is used without reference to contract law at all, as in the Butts case, or in Learned Hand's opinion in Connolly v. Medalie, 58 F.2d 629, 630 (2d Cir.1932)--a search and seizure case. On the other hand, the two decisions by the Supreme Court of Illinois that discuss the doctrine do not tie it to the litigation context at all. They describe it as a doctrine that estops a contract party to change the ground on which he has refused to perform the contract, whether or not it was a ground stated in a pleading, or otherwise in the course of litigation. An argument for confining the doctrine in this fashion is that otherwise it would step on the toes of judicial estoppel. That doctrine requires separate suits; mend the hold does not. So, interpreted as a procedural doctrine rather than as a contractual one, mend the hold would make judicial estoppel superfluous. Yet the Illinois courts believe that they coexist happily. Rural Electric Convenience Cooperative Co. v. Illinois Commerce Commission, supra, 118 Ill.App.3d at 652-54, 73 Ill.Dec. at 954-55, 454 N.E.2d at 1203-04.
 
 
 20
 Continental elides the interpretive and substance-procedure questions by sensibly declining to advocate a rigid view of the doctrine. It concedes that if pretrial discovery or other sources of new information justify a change in a contract party's litigating position as a matter of fair procedure under the federal rules, that change should not be deemed a forbidden attempt to "mend the hold." By this concession Continental not only eliminates a conflict between the doctrine and the federal rules but also brings the doctrine into closer phase with the good-faith duty of contract parties that seems to us, consistent with the views expressed by the author of Larson, to supply the doctrine's modern rationale; for it is not bad faith to change one's position on the basis of information that could not have been acquired earlier. Given Continental's concession, we need not try to determine the doctrine's outer bounds: need not try to determine, for example, whether it applies outside the contract area and whether it precludes alternative pleading from the outset, as distinct from a change in position not motivated by new information or other changed circumstances.
 
 
 21
 Continental argues with much force that, even limited as far as it is willing to limit it, the "mend the hold" doctrine bars the insurers' change of position. Not only does it appear that the insurers violated Rule 11 of the Federal Rules of Civil Procedure by adopting their initial litigating position without a reasonable inquiry into the facts--merely copying allegations from someone else's complaint--but they did not change their position on the basis of further inquiry through pretrial discovery or otherwise but only because the district court threw cold water on their argument that the egregiousness of the directors' conduct was a bar to liability under the insurance policy. National Union Fire Ins. Co. v. Continental Illinois Corp., supra, 666 F.Supp. 1186-91.
 
 
 22
 The indications that the "mend the hold" doctrine may apply here thus are strong but there have been no findings and Continental does not argue that the state of the record permits a definitive conclusion at this time. It argues only that it should have been allowed to develop its case, and for this it needed to place the original complaint in evidence. That complaint contains the defense that Continental contends the insurers impermissibly abandoned. Without the complaint, the argument could not be addressed. The complaint should have been admitted; it is indisputably relevant to a possibly dispositive issue. In a new trial the issue should be presented to the jury in an instruction that tells it that the insurance companies were not allowed to change the defense to liability presented in their original pleading unless the change was based on new information that could not have been obtained at the time of that pleading or on other changed circumstances to which the companies could properly respond without being deemed to violate their duty of dealing in good faith with their contractual partner, Continental.
 
 
 23
 The complaint was admissible for two additional purposes as well: to show that the directors were exposed to liability, a condition of the insurance policy, and, what is very similar, to impeach (contradict) the insurance companies' testimony that the directors were not in fact at risk. Contractor Utility Sales Co. v. Certain-Teed Products Corp., 638 F.2d 1061, 1084 (7th Cir.1981). The first point is obvious, and the second can be explained very briefly. The complaint showed that Harbor and Allstate had at one time taken the position that Continental's directors had been guilty of serious wrongdoing. At trial the insurance companies took the position that the directors had been guilty of no wrongdoing. Continental was entitled to confront the companies' witnesses, who included executives who had participated in the decision to bring the declaratory judgment action, with a pleading in which the companies had asserted the opposite. The witnesses might have been able to explain away the apparent contradiction, for example by arguing, as the companies do in their briefs in this court, that they just did not know the true facts when they filed the complaint. The jury would have assessed the plausibility of the explanation. There was no ground for taking the matter from the jury.
 
 
 24
 The next ruling of which Continental complains is the judge's permitting a lawyer to testify for the insurance companies, as an expert witness, on the meaning of "indemnity." The critical language of the charter authorizes Continental to indemnify a director "against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him." Harbor and Allstate contend that since the directors never incurred any expense, the charter did not authorize Continental to indemnify them; hence there is no liability under the policy. It was to bolster this argument that they presented the testimony of the lawyer.
 
 
 25
 The charter is ambiguous, and therefore testimony, including expert testimony--including in suitable cases testimony by a lawyer--was a permissible aid to interpretation. City of Clinton v. Moffitt, 812 F.2d 341, 344 (7th Cir.1987); Stamatakis Industries, Inc. v. King, 165 Ill.App.3d 879, 887, 117 Ill.Dec. 419, 424, 520 N.E.2d 770, 775 (1987); Nucor Corp. v. Nebraska Public Power District, 891 F.2d 1343, 1350 (8th Cir.1989); Phillips Oil Co. v. OKC Corp., 812 F.2d 265, 281 (5th Cir.1987); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 512 (2d Cir.1977). This is black-letter law, and neither side questions it. And yet it might seem to jostle with the familiar principle of interpretation, as well established in Illinois as anywhere, that ambiguities in insurance contracts are to be resolved against the insurance company. Strzelczyk v. State Farm Mutual Automobile Ins. Co., 113 Ill.2d 327, 100 Ill.Dec. 808, 497 N.E.2d 1170 (1986). Given this rule--if there is an ambiguity, the insured wins--why would there ever be an occasion for attempting to resolve an ambiguity in an insurance contract by evidence? Yet that is exactly what was done in LaSalle National Ins. Co. v. Executive Auto Leasing Co., 121 Ill.App.2d 430, 437-38, 257 N.E.2d 508, 512 (1970). Reconciliation is possible along the following lines. If an insurance contract is ambiguous either party should be allowed to introduce evidence to disambiguate it. But if, all such evidence having been considered, the meaning of the contract is still uncertain, then the insured wins. In other words, the interpretive principle (favor the insured) is merely a tie-breaker. Continental Casualty Co. v. Pittsburgh Corning Corp., 917 F.2d 297, 300 (7th Cir.1990).
 
 
 26
 A lawyer experienced in indemnification matters was a proper witness to opine on the probable meaning of the charter. Marx & Co. v. Diners' Club, Inc., supra, 550 F.2d at 512. But the lawyer who testified in this case based his opinion (in major part at any rate) on an examination of the word "indemnity" as it is used in judicial opinions. There, however, the word frequently is used not to describe an explicit term in a contract but instead to denote one of several noncontractual legal doctrines, such as the doctrine governing indemnification of one joint tortfeasor by another. In re Oil Spill by Amoco Cadiz, 699 F.2d 909, 915 (7th Cir.1983); Restatement (Second) of Torts Sec. 886B(1) (1977); Prosser and Keeton on the Law of Torts 341-45 (5th ed. 1984). There was no basis for an assumption that the draftsmen of Continental's charter, in authorizing the company to indemnify its directors and officers for expenses caused by their (allegedly) wrongful acts, meant to incorporate some doctrine of tort law.
 
 
 27
 This objection is distinct from the conventional one that the judge in effect delegated to a lawyer appearing as a witness for one of the parties the task of instructing the jury. But the conventional objection has its own force. By allowing the insurance companies' witness to tell the jury what the witness's legal research had turned up on the meaning of a key term in the case, the judge allowed the jury to infer that it could look to that witness for legal guidance; and by doing this the judge impermissibly tilted the balance of power between the parties toward the insurance companies. United States v. Baskes, 649 F.2d 471, 479 (7th Cir.1980); Marx & Co. v. Diners' Club, Inc., supra, 550 F.2d at 512; United States v. Zipkin, 729 F.2d 384, 387 (6th Cir.1984); Specht v. Jensen, 853 F.2d 805 (10th Cir.1988) (en banc).
 
 
 28
 The error in admitting the lawyer's testimony would be harmless if Continental's suggested interpretation of the charter were highly implausible. But it is not. The purpose of the charter provision is to permit Continental to hold its directors and officers harmless for the liability that they incur in the performance of their corporate duties. From this standpoint it is a detail whether the director or officer first incurs an expense to a plaintiff which Continental then reimburses or Continental pays the plaintiff directly. The latter route is merely more direct; it cuts out the middleman. The charter does not say that Continental may not indemnify the director or officer until he pays; the only condition is that the expense, etc. be "actually incurred"; and though above we used the word as a synonym for "paid," often it is used as a synonym for "accrued" or "obligated" instead, and even to denote an expense necessitated by some event though there is as yet no contractual obligation to pay. Fuller v. CBT Corp., 905 F.2d 1055, 1059 (7th Cir.1990). You might for example be the obligor under a promissory note due next week, and you might say that you had "incurred" an obligation under the note.
 
 
 29
 Granted, Continental would have had a much easier row to hoe in this case if the settlement had obligated the directors, jointly with Continental, to pay the amount specified in the settlement, or some part of that amount. For then it would be clear that the directors had an accrued--loosely, an "incurred"--obligation, albeit they had not yet been required to pay it. It is a little difficult to see how a potential liability that never crystallized in an actual obligation can be an expense "actually incurred." But strained as Continental's reading is, it is not so strained that it can be considered barred as a matter of law. (It is supported for example by the Fuller case.) The district court was right to send the interpretive question to the jury but wrong to permit a lawyer to testify to the legal meaning of indemnification.
 
 
 30
 Having resolved the issue of liability in the insurance companies' favor, the jury did not reach the issue of damages. But as the parties argue it at length in their briefs and there must be a new trial, we shall discuss the issue in the hope of furnishing guidance for the trial and perhaps also of facilitating settlement.
 
 
 31
 The settlement of $17.5 million in the two securities fraud cases was paid by Continental, a defendant in the combined suits. How much of that amount represents indemnification of the directors and other insured persons against whom claims had been made for their liability to the plaintiffs? Harbor and Allstate say none of it--or at most $20,000, for that was the demand of the named plaintiff in the suit that named the directors, and that suit unlike the other was not certified as a class action. But this is incorrect. That suit was certified as a class action, when the judge approved the settlement; moreover, the other suit was against directors and officers as well as against Continental, albeit the directors and officers were not identified by name.
 
 
 32
 Continental on the other hand claims, with equal unreason as it seems to us, that the insurers must be obligated to it for the full $17.5 million. This argument assumes, quite without evidence, that Continental's liability derived solely from the wrongful acts by the five directors named in the suit. The suits accused Continental of a massive fraud. The five directors named as defendants in the second suit may have been the sole authors of that fraud, but another possibility--and indeed one implied by the first suit with its twenty-five "John Doe" defendants--is that other agents or employees of Continental contributed materially to the fraud and that without their activities the settlement would have been lower because the damage done to the members of the class would have been less. To the extent that the amount for which Continental settled was larger than it would have been but for the misfeasance of these other persons--either noninsured persons or persons against whom no claim was made--Continental's entitlement to reimbursement in this suit would be cut down. PepsiCo, Inc. v. Continental Casualty Co., 640 F.Supp. 656, 661-62 (S.D.N.Y.1986).
 
 
 33
 The possibility that activities of noninsured persons jacked up the settlement may be more theoretical than real. The insurance policy covers directors and officers, and there is no suggestion--beyond the bare fact that the first suit included an unspecified number of John Doe employees, besides directors and officers, as defendants--that Continental's liability might have been due in significant part to the misdeeds of uninsured persons, namely employees of Continental who were neither directors nor officers. But the insurance policy kicks in only if there is a claim against an insured person, and the only definite claim was against the five directors named in the second suit. Granted, the twenty-five "John Does" named as defendants along with Continental in the first suit included directors and officers, but it is unclear whether until a John Doe is given his real name a claim has been made against him within the meaning of the policy; certainly a judgment could not be executed against an unnamed defendant. Fortunately we need not resolve the question of the status of the "claims" against the John Does. It is enough to point out that on remand it will be necessary for the district court to determine how much larger the settlement was by virtue of the activities of persons against whom no claim within the meaning of the policy was made, and to cut down Continental's $17.5 million claim against the insurance companies accordingly.
 
 
 34
 There may seem to be another and even graver problem with Continental's claim for reimbursement of that entire amount. Even if the five directors who are the only named individual defendants in the suits were the sole authors of the alleged fraud, Continental was of course a proper defendant; and it is arbitrary to assume that if the suits had proceeded to trial and judgment the plaintiffs would have elected to seek to collect the entire judgment from the directors. Yet under the law governing the allocation of responsibility among joint tortfeasors, one whose only liability is derivative, such as an employer's liability for a tort committed by an employee, has always been able to obtain full indemnification from the tortfeasors whose liability is primary (the employee in our example, corresponding to the directors in this case). Stawasz v. Aetna Ins. Co., 99 Ill.App.2d 131, 240 N.E.2d 702 (1968); Steele v. Hartford Fire Ins. Co., 788 F.2d 441, 446 (7th Cir.1986); GAB Business Services, Inc. v. Syndicate 627, 809 F.2d 755, 759 (11th Cir.1987); Allstate Ins. Co. v. Fowler, 480 So.2d 1287, 1290 (Fla.1985). With specific reference to directors, see National Union Fire Ins. Co. v. Continental Illinois Corp., supra, 666 F.Supp. at 1193. (These, by the way, are illustrations of "indemnity" as a term of legal art, as opposed to a term in a contract.) So if the suit had gone to judgment and the plaintiffs had sought to collect any part of the judgment from Continental, Continental would have been entitled to turn around and demand reimbursement from the directors. The entire cost of the judgment would have become an expense to them. The charter authorized Continental to waive this right, and the loss sustained by it as a result of the waiver--the loss for which Harbor and Allstate insured it--would be the entire amount of the judgment.
 
 
 35
 Against this it can be argued that it is unrealistic to suppose that anyone would ever have tried to obtain $17.5 million from these five individuals. Suppose that because of doubts about the directors' solvency, the plaintiffs, if they had sued only the directors, would have settled for $5 million. In what sense could it be said that the directors had lost, even prospectively or hypothetically, the $17.5 million for which Continental had indemnified them? In the following sense: The point of the insurance policies plus the provision in Continental's charter for indemnifying the directors was to insure them against liability and then shift the liability for this insurance to Harbor and Allstate--was, in other words, to eliminate the very solvency risk that is the premise of the argument we are evaluating. To allow the insurance companies an allocation between the directors' liability and the corporation's derivative liability for the directors' acts would rob Continental of the insurance protection that it sought and bought. Nodaway Valley Bank v. Continental Casualty Co., 715 F.Supp. 1458, 1466 (W.D.Mo.1989). We conclude that the entire $17.5 million of joint liability should be allocated to the directors and therefore that Continental is entitled to recover up to the insurance limits, except for the portion, if any, of Continental's derivative liability that was due to the conduct of other directors, officers, or employees, besides those directors and officers against whom claims were made within the meaning of the policy.
 
 
 36
 All this of course is on the assumption that Continental establishes liability in the new trial that we are ordering.
 
 
 37
 The cross-appeal raises two issues. First, the district court had entered judgment in Continental's favor for reimbursement of several hundred thousand dollars in attorney's fees incurred by the directors in the securities-fraud suits, for which Continental had--in fact--indemnified them. The insurance companies claim that Continental did not make a proper claim under the policy for the reimbursement of this expenditure. The policy provides that if the insured becomes aware of any occurrence that may later give rise to a claim for indemnity by an officer or director, it must give the insurance company notice; if that notice is given within the policy period (i.e., before expiration of the policy), then the claim, even though filed later, will be considered to have been made within the policy period. This was done with regard to these fees. The policy further provides, however, that if and when a claim against the director or officer is actually made, the insured "shall as a condition precedent to its rights under this policy give to the [insurance] company notice as soon as practicable in writing of any such claim." Also that "no cost, charges and expenses [in indemnifying directors or officers] shall be incurred without the consent of the [insurance] company, which consent shall not be unreasonably withheld." The claim arose and the expenses (the directors' legal fees) were incurred in the summer of 1985. No written notice was submitted at that time, and Continental never sought the insurance companies' consent to indemnify the directors. The second omission was harmless, because the insurance companies do not attempt to show that it would have been reasonable for them to withhold their consent to the indemnification of these fees. But the first is fatal. Written notice was not submitted until 1988. That was not as soon as practicable.
 
 
 38
 Continental failed to comply with an explicit condition precedent and is therefore barred from recovering on its claim. Its argument that occurrence notice and claim notice are alternative rather than sequential requirements is contrary to the language and evident purpose of the requirements. The insurer wants to know whether there is a possibility that it will be receiving a claim after the policy period, but of course it also wants to receive notice of that claim when and if it materializes. It can enforce this vital condition without proving that it was harmed by the violation of it. Sisters of Divine Providence v. Interstate Fire & Casualty Co., 117 Ill.App.3d 158, 162, 72 Ill.Dec. 731, 734, 453 N.E.2d 36, 39 (1983).
 
 
 39
 Our ruling moots Continental's contention that it was entitled to prejudgment interest on this claim.
 
 
 40
 Last, the insurance companies argue that although the securities-fraud suits out of which all of Continental's claims ultimately arise were filed in 1984, they should be backdated to 1982, a policy year for which as chance would have it the companies' insurance limits have already been exhausted by other claims arising out of the Penn Square fiasco. We can find nothing in the policy that justifies such backdating. The suits were an occurrence that, occurring as they did during the 1984 policy year, entitled Continental, upon proper notice, to file a claim in a subsequent year arising out of that occurrence. The policy is intended after all to insure against expenses arising out of claims made against directors or officers; those claims are the occurrences giving rise to the insured's right to file an (insurance) claim; and the claims against the directors were made in 1984. To go behind these claims and ask what triggered them, and to treat that triggering event as the occurrence, would be an unnatural reading of the policy for which the insurance companies offer no justification. National Union Fire Ins. Co. v. Continental Illinois Corp., 673 F.Supp. 300 (N.D.Ill.1987).
 
 
 41
 The judgment in favor of Continental on its request for reimbursement of the attorneys' fees for which it indemnified its directors is reversed with instructions to dismiss that claim. The judgment for the insurance companies on the remaining claims is also reversed, and the case is remanded to the district court for a new trial in conformity with this opinion. No costs shall be awarded in this court.
 
 
 42
 REVERSED AND REMANDED, WITH DIRECTIONS.