RURAL ELECTRIC CONVENIENCE COOPERATIVE COMPANY, Plaintiff-Appellant, *v.* ILLINOIS COMMERCE COMMISSION *et al.*, Defendants-Appellees.

Fourth District    No. 14252

Opinion filed December 30, 1977.—Modified on denial of rehearing February 9, 1978.

CRAVEN, J., dissenting.

Edward G. Pree and Michael W. Hogan, both of Pree and Pree, of Springfield (Albert J. Cross and John W. DeMoss, of counsel), for appellant.

William J. Scott, Attorney General, of Chicago (Hercules F. Bolos, Rodney C. Howard, and Mary C. Ubatuba, Assistant Attorneys General, of counsel), for appellee Illinois Commerce Commission.

Elmer Nafziger, of Nafziger & Otten, of Springfield, for appellee Central Illinois Public Service Company.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Issue: Electric Supplier Act.

The RECC took CIPS before the ICC, which held with CIPS.

In short—we agree.

Rural Electric Convenience Cooperative (Rural Electric) brought an action before the Illinois Commerce Commission alleging they were entitled to provide electrical service to the Freeman Coal Company at its new building site in Macoupin County. Central Illinois Public Service Company (CIPS) challenged Rural Electric's right to provide that service and the Illinois Commerce Commission agreed that CIPS—not Rural Electric—was entitled to provide the service in accordance with the Electric Supplier Act. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 401 *et seq.*) The circuit court affirmed the Commission and this appeal was taken.

The thrust of Rural Electric's appeal rests upon three issues. In its first argument, Rural Electric contends that the Illinois Commerce Commission and the circuit court erred in their interpretation of the parties' service area agreement. The agreement gives each company the right to serve areas in which they are already providing service subject to the following exception:

"* * * [H]owever, whenever the electrical load of a prospective customer in any area outside of incorporated areas is such that its

anticipated load during the first year of normal operation will require, as determined in accordance with accepted engineering practices, that the load be supplied through a connection to and/or extension of an existing as of July 2, 1965, line having a voltage of 34.5 KV or higher, the supplier shall be determined under the Electric Supplier Act as appraised July 2, 1965."

We agree with the ICC that this exception purposely left open the question as to who is entitled to serve any new loads that may locate in any of the parties' respective service areas and which would require line voltage of 34.5 KV or higher. We also concur with CIPS that the investment in a 34.5 KV line is substantial and electrical suppliers would not enter into service area agreements if by so doing their 34.5 KV or higher voltage lines existing as of July 2, 1965, would be rendered useless as far as providing service from such lines to any such new loads is concerned, unless availability to serve such new loads is left open for determination under the Electric Supplier Act. Therefore, the Electric Supplier Act must be consulted.

For its second argument, Rural Electric contends that Section 5 of the Act is the relevant section and is dispositive of this case. Section 5 reads as follows:

"Each electric supplier is entitled, except as otherwise provided in this Act or (in the case of public utilities) the Public Utilities Act, to (a) furnish service to customers at locations which it is serving on the effective date of this Act." Ill. Rev. Stat. 1975, ch. 111 2/3, par. 405.

■■ The effective date of the Act was July 2, 1965, and Rural Electric claims it was serving the site of the Freeman Coal Mine on section 23 on that date. The only competent evidence supporting Rural Electric is the testimony of its manager, Roy Goode, who testified that Rural Electric was furnishing the former owner of section 23, a farmer, with electrical service. Even if Rural Electric was in fact furnishing rural and domestic power to the section, we do not conclude that farm buildings served by low voltage distribution lines and a coal mine requiring a 34.5 KV line can be equated as the same customer at the same location under the intent of section 5 of the Electric Supplier Act. (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 405.) If such an intent were to be attributed to the Act, it would have the effect of allowing an electrical supplier the absolute right to serve an area in which it was providing minimal service even though the new customer might require service of a completely different magnitude which would be entirely beyond the scope of the minimal supplier.

In this type of situation, section 8 of the Act must be consulted. That provision enunciates in detail the criteria to be used in determining which supplier can best furnish the proposed service. (Ill. Rev. Stat. 1975, ch.

111 2/3, par. 408.) Although it is well within our province to read the statute differently, we agree with the Commerce Commission's interpretation of that provision of the statute. (See *Mystik Tape v. Pollution Control Board* (1973), 16 Ill. App. 3d 778, 306 N.E.2d 574, *reversed on other grounds* (1975), 60 Ill. 2d 330, 382 N.E.2d 5.) In accordance with section 8 of the Act (Ill. Rev. Stat. 1975, ch. 111 2/3, par. 408), the Commission found: (a) the customer had expressed no preference as to which supplier should furnish the proposed service; (b) CIPS was first furnishing service in the area; (c) neither supplier assisted in creating the demand for the proposed service; and (d) the total additional investment required is essentially equal under both electric suppliers' plans of service. Although these findings are supported by the record, they are not determinative of the ultimate question and are to be accorded lesser weight by the Commission than other considerations embodied in the Act. Ill. Rev. Stat. 1975, ch. 111 2/3, par. 408.

■■■ The gist of the controversy centers around the two findings of the Commission which are to be accorded the most weight in determining which supplier is to be given the authority to furnish electrical power to the Freeman Coal Company; namely: (1) which supplier had existing lines in proximity to the premises to be served; and (2) which supplier would better serve the public interest in providing the electrical service. The Commission found for CIPS on both questions. These findings and decision of the Commission are to be given great weight and not to be set aside unless it clearly appears the findings are against the manifest weight of the evidence. (*Galt v. Illinois Commerce Com.* (1963), 28 Ill. 2d 501, 192 N.E.2d 906.) We find that these determinations made by the Illinois Commerce Commission are not contrary to the manifest weight of the evidence and therefore affirm the Commission and the circuit court.

Although there is a dispute as to which supplier has existing lines in proximity to the mine site, the mine required 34.5 KV lines and the 34.5 KV line of CIPS was clearly closer in proximity to any 34.5 KV lines of Rural Electric. In fact, Rural Electric had no 34.5 KV lines and would only be able to supply such service if Western Illinois Power Cooperative constructed such a line so that Rural Electric could tie into it. Therefore, we agree with the Commission that CIPS did have proximity by virtue of its existing 34.5 KV line.

We also agree with the Illinois Commerce Commission that public interest requires that CIPS furnish the service. In doing so, we give considerable deference to the Commission's expertise in this area:

> "It has likewise been recognized that decisions of the Commission are entitled to great weight as being the judgment of a tribunal appointed by law and possessing an expertise in the field of public utilities born of informed experience." (*Sunset Trails Water Co. v.*

*Illinois Commerce Com.* (1972), 7 Ill. App. 3d 449, 456, 287 N.E.2d 736, 740.)

Since CIPS is accustomed to serving large industrial users and can sufficiently handle the electrical load required by the new mine, the decision of the Illinois Commerce Commission that the public interest would be better served by service by CIPS rather than Rural Electric (which admitted at oral argument that it basically served only rural and domestic customers) was not against the manifest weight of the evidence.

Judgment affirmed.

TRAPP, J., concurs.

Mr. JUSTICE CRAVEN, dissenting:

From this record we learn, and indeed it is uncontroverted, that the Rural Electric Convenience Cooperative was providing electrical service at the location here involved on and before July 2, 1965. Further it is quite clear from this record that Rural Electric's power lines were in the immediate vicinity of the proposed site on the effective date of the Electric Supplier Act, and indeed an examination of the maps in evidence indicates that the area is exclusively served by Rural Electric.

Thus, under the plain language of section 5 of the Act, it is clearly provided that "Each electric supplier is entitled, except as otherwise provided in this Act or (in the case of public utilities) the Public Utilities Act, to (a) furnish service to customers at *locations which it is serving* on the effective date of this Act." (Emphasis added.) Ill. Rev. Stat. 1975, ch. 111 2/3, par. 405.

Since it is clear that Rural Electric was serving the location on the effective date of the Electric Supplier Act and that Act provides if it was doing so, it can continue to do so, I would reverse the order of the circuit court. The quantum of electricity being supplied by Rural Electric is of no consequence.