RURAL ELECTRIC CONVENIENCE COOPERATIVE COMPANY, Plaintiff-Appellee, *v.* ILLINOIS COMMERCE COMMISSION, Defendant—(Central Illinois Public Service Company, Defendant-Appellant).—RURAL ELECTRIC CONVENIENCE COOPERATIVE COMPANY, Plaintiff-Appellee, *v.* ILLINOIS COMMERCE COMMISSION, Defendant-Appellant—(Central Illinois Public Service Company, Defendant).

Fourth District   Nos. 4—83—0019, 4—83—0056 cons.

Opinion filed October 11, 1983.—Rehearing denied November 4, 1983.

William S. Hanley and Stephen R. Kaufmann, both of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant Central Illinois Public Service Company.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos, of Illinois Commerce Commission, Special Assistant Attorney General, and Edward P. O'Brien, Assistant Attorney General, of counsel), for appellant Illinois Commerce Commission.

Edward G. Pree, of Pree & Pree, and Jon W. DeMoss, both of Springfield, for appellee.

JUSTICE MILLER delivered the opinion of the court:

Rural Electric Convenience Cooperative Company (RECC) filed a complaint with the Illinois Commerce Commission (Commission), pursuant to the Electric Supplier Act (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 401 *et seq.*), requesting that the Commission declare that RECC was entitled to provide electric service to the Freeman United Crown III

Coal Mine in Macoupin County. The Commission found that Central Illinois Public Service Company (CIPS) should furnish electric service to the Crown III Mine. RECC sought administrative review of the Commission's decision, and the circuit court of Macoupin County reversed the Commission's decision and held that RECC was entitled to provide service to the mine. CIPS and the Commission appeal from the judgment of the circuit court.

RECC filed a complaint with the Commission on July 10, 1978. In its complaint, RECC alleged that it had received notice from CIPS of a proposed extension of electrical service to the Freeman United Crown III Coal Mine in Macoupin County. RECC alleged that it had the right to serve the mine pursuant to a service-area agreement entered into by RECC and CIPS or, in the alternative, that it was entitled, under the provisions of the Electric Supplier Act (Ill. Rev. Stat. 1977, ch. 111⅔, par. 401 *et seq.*), to provide such service. CIPS answered, denying RECC's allegations.

The Crown III Mine's main surface facilities are located in section 1 of Nilwood Township in Macoupin County. Freeman United acquired a total of 810 surface acres for its mining operation and mineral rights in 17,500 subsurface acres. Freeman United estimated that the mine would be in production by May 1982. Freeman has erected buildings, roadways and railroad tracks on the surface acreage it owns and has no plans to use any of that area for farming purposes.

Several hearings were held over a 10-month period. Roy Goode testified that he is the manager of RECC. He stated that RECC had provided electric service to Marvin Moore, whose farm was located on a portion of the land comprising the surface area of the Crown III Mine. RECC began serving the Moore farm in 1961 and service was terminated in 1978. The nearest CIPS line in existence on July 2, 1965, was about one mile from the present site of the mine.

Goode testified that RECC purchases its electricity from Western Illinois Power Cooperative (WIPCO). RECC does not own any transmission (34.5 KV or higher) lines. The service provided to Marvin Moore by RECC was metered at 15 amps and 240 volts. RECC's electricity is supplied by WIPCO through 34.5 KV and 69 KV transmission lines. WIPCO generates its own electricity and also purchases electricity from CIPS. In order to provide electricity to RECC for the purpose of serving the Crown III Mine, WIPCO would purchase electricity from CIPS.

Richard Fairchild, a member of an engineering consulting firm hired by RECC to provide electrical consulting services, testified that RECC is planning to build a substation in Waggoner in late 1983 or

early 1984. This substation would be served by a 34.5 KV transmission line furnished by WIPCO. The WIPCO transmission line would run near the Crown III Mine. RECC proposed to tap that line and run a transmission line .35 miles to the Crown III Mine. This transmission line would connect to a metering structure on the premises built by WIPCO and RECC. Fairchild stated that the WIPCO transmission line would tap the CIPS 34.5 KV line, go a mile south, and then turn west .35 miles.

Francis Harmon testified that he is the chief electrical engineer for Freeman United and is familiar with the Crown III operation. The surface areas of the Crown III Mine will require 30-40% of the total power demand at the mine. The mine itself will extend over 17,500 acres at depths of up to 2½ miles. The total demand for power in the mine's first normal year of operation will be 7,000 to 7,500 kilowatts.

Pursuant to the Commission's rules, the prepared statement of R. W. Donaldson was read into the record by the respondent. Donaldson indicated that CIPS proposed to service the Crown III Mine by an extension of the transmission line approximately 1.35 miles from the CIPS existing 34.5 KV line. He stated that RECC has only 7.2/12.5 KV distribution lines in the area, which were not sufficient to service the mine. Donaldson stated that accepted engineering practices required that the Crown III Mine be supplied through a connection to or extension of an existing 34.5 KV line. Donaldson testified that the power demand at the mine would be 700 times greater than the demand of the average farm.

On February 17, 1982, the Commission entered an order directing CIPS to continue furnishing service to the Crown III Mine. A motion for reconsideration was filed by RECC and denied by the Commission. RECC then filed for administrative review in the circuit court of Macoupin County. A hearing was held on December 6, 1982, before Judge Russell and a letter opinion was filed on December 10, 1982. In his opinion, Judge Russell reversed the Commission and found that RECC was entitled to provide service to the mine. A written order was filed on December 30, 1982. A notice of appeal was filed on January 6, 1983.

Both RECC and CIPS have filed motions for judicial notice of certain exhibits in this court. Those motions have been taken with the case and are now decided.

In its motion, CIPS asked this court to take judicial notice of 20 exhibits. Exhibits 1 through 18 are orders of the Commission approving certain service-area agreements between CIPS and various electric cooperatives. CIPS maintains that its agreement with RECC is an

adaptation of a model agreement which also forms the basis of the agreements comprising exhibits 1 through 18. Exhibit 19 is a copy of a brief filed by RECC's attorneys in a Commission proceeding involving Wayne-White Electric Cooperative. CIPS contends that this brief is demonstrative of "the prior interpretation of the 'model agreement' " by electric cooperatives in this State. Finally, CIPS asked that judicial notice be taken of RECC's brief in General No. 14252, filed in this court on May 20, 1977. CIPS maintains that the arguments made by RECC in that brief are inconsistent with the position it has taken in this case.

RECC, in its motion, asks that the court take judicial notice of its brief and the brief of CIPS filed with the Commission in ESA 208. RECC maintains that these briefs, filed in a subsequent proceeding, rebut the CIPS claim that, because RECC did not raise a theory of contract interpretation until it filed its reply brief with the Commission, CIPS did not have an opportunity to present evidence to the Commission on that issue.

■■ ■ Judicial notice may be taken by an appellate tribunal at any time, even if judicial notice was denied by the trial court or the parties did not seek it below. (*In re Estate of Ersch* (1963), 29 Ill. 2d 572, 195 N.E.2d 149; *Wheeler v. Aetna Casualty & Surety Co.* (1973), 11 Ill. App. 3d 841, 298 N.E.2d 329, *vacated on other grounds* (1974), 57 Ill. 2d 184, 311 N.E.2d 134.) Orders of the Illinois Commerce Commission may be judicially noticed as public records (*Nordine v. Illinois Power Co.* (1965), 32 Ill. 2d 421, 206 N.E.2d 709). CIPS exhibits 1 through 18 are Commission orders approving various service-area agreements. These agreements are relevant to the CIPS claims that the agreement in this case was based upon a model agreement commonly used by CIPS and certain electric cooperatives. The motion with respect to exhibits 1 through 18 is allowed.

Exhibit 19 is a brief filed by RECC's attorneys on behalf of Wayne-White Electric Cooperative in a Commission proceeding involving CIPS. Historically, courts refused to take judicial notice of records of other proceedings either in their court or before other tribunals. (*People v. McKinlay* (1937), 367 Ill. 504, 11 N.E.2d 933; *People ex rel. Zilm v. Carr* (1914), 265 Ill. 220, 106 N.E. 801.) Recent cases indicate a more flexible approach to the question. In *People v. Davis* (1976), 65 Ill. 2d 157, 357 N.E.2d 792, the trial court took judicial notice of a guilty plea by the defendant in a prior proceeding in that court. The supreme court held that judicial notice of the earlier plea was proper. The court stated:

"In our judgment, the extension of the doctrine of judicial no-

tice to include facts which, while not generally known, are readily verifiable from sources of indisputable accuracy is an important aid in the efficient disposition of litigation, and its use, where appropriate, is to be commended." (65 Ill. 2d 157, 165, 357 N.E.2d 792.)

In *Davis*, neither the fact that the conviction occurred nor that defendant was the person convicted was disputed. See also *May Department Stores Co. v. Teamsters Union Local No. 743* (1976), 64 Ill. 2d 153, 355 N.E.2d 7 (court took judicial notice of NLRB determination letter where both parties agreed the letter was accurate); *Walsh v. Union Oil Co.* (1972), 53 Ill. 2d 295, 291 N.E.2d 644 (judicial notice of other proceedings in other courts is proper where those proceedings involve the same parties and were determinative of the result in the pending case).

■ However, we decline to take judicial notice of exhibit 19 because it is not relevant to this case. The fact that the attorneys representing RECC may have taken a different position in litigation involving another party is not relevant to the question of whether judicial estoppel should be invoked in this case. RECC should not be held to have adopted the positions its attorneys took in their representation of a completely separate client in a similar proceeding.

■ Exhibit 20 is the brief of RECC filed in an earlier proceeding in this court. CIPS contends that this brief is relevant on the issue of RECC's previous interpretation of the service-area agreement at issue in this case. We agree. The CIPS motion for judicial notice is allowed as to exhibit 20. See *Davis*.

A similar analysis would govern RECC's motion for judicial notice. Therefore, the motion of RECC for judicial notice of its brief and the brief of CIPS filed in ESA 208, a subsequent proceeding before the Commission, is granted.

The record shows that the parties entered into a "service area agreement" on February 19, 1969. This agreement provides, in pertinent part:

"1. The parties hereto covenant and agree that each shall continue to be entitled to (a) furnish service to customers at locations which each was serving on July 2, 1965, ***.

2. The parties hereto covenant and agree that Cooperative shall be entitled exclusively to serve all consumers with their electric service requirements in the area or areas designated as RECC on the maps hereto attached as Appendices 1 to 5, inclusive, and Utility shall be entitled exclusively to serve all consumers with their service requirements in the area or areas

designated as CIPS on said Appendices 1 to 5, inclusive, provided, however, that each party may continue to serve any locations or premises which it is entitled to serve under Paragraph 1 above even though such locations or premises be located in the areas designated on Appendices 1 to 5, inclusive, as the area of the other party; *** and provided further, however, whenever the electrical load of a prospective consumer in any area outside of incorporated areas is such that its anticipated load during the first year of normal operation will require, as determined in accordance with accepted engineering practices, that the load be supplied through a connection to and/or extension of an existing as of July 2, 1965 line having a voltage of 34.5 KV or higher, the supplier shall be determined under the Electric Supplier Act as approved July 2, 1965."

In the proceedings before the circuit court, RECC maintained that it had a right under paragraph 1 of the service-area agreement to serve the Crown III Mine and that right was independent of any of the provisos contained in paragraph 2 of the agreement. The trial court accepted RECC's argument and held that, under paragraph 1 of the agreement, RECC had a right to serve the mine because it had been providing service to the same location on July 2, 1965.

CIPS maintains that RECC did not take the position that it had the right to provide service under paragraph 1 of the agreement until after the case was marked "heard and taken" and briefing had begun in the Commission proceeding. CIPS argues that RECC sought administrative review under a different theory and may not now assert its new theory regarding the basis of its right to serve the Crown III Mine. CIPS claims that RECC has employed the "mend the hold" strategem in this case.

CIPS cites several cases in support of its position. In *Townsend v. Postal Benefit Association* (1931), 262 Ill. App. 483, defendant insurance company claimed that it was not liable to the plaintiff because the insured was not insured by the defendant at the time of the insured's death. Defendant switched its defense during the suit and argued that plaintiff failed to give the defendant proper notice of the insured's death. The trial court granted judgment to the defendant. The appellate court reversed, stating:

"When appellee elected to place its defense on the ground that the insured was not a member at the time of her death it will not be permitted, after costs and expenses have been incurred in prosecuting the action, to mend its hold and set up other defenses, even though at the outset such other defenses

may have been available. [Citation.]" 262 Ill. App. 483, 488.

In *Larson v. Johnson* (1953), 1 Ill. App. 2d 36, 116 N.E.2d 326, defendants sought to defend against an action for specific performance of a contract to purchase a one-half beneficial interest in certain real estate on the grounds that plaintiffs had acted fraudulently in obtaining execution of the agreement. The case was referred to a master, who found for plaintiffs on the issue of fraud, but held that specific performance should not be granted because the contract was indefinite.

On appeal, plaintiffs argued that defendants elected to base their defense on fraud and should not have been allowed to "mend their hold" and shift their position to attack the indefiniteness of the contract. The appellate court agreed with plaintiffs, holding that once defendants gave a reason for their conduct in the controversy, they could not change their ground and assert a different basis for their action.

■ In the present case, RECC filed a complaint with the Commission listing several grounds which RECC claimed gave it the right to serve the Crown III Mine. In paragraphs 4 and 5 of its complaint, RECC set up paragraphs 1 and 2 of the service-area agreement and claimed that it had the right to serve the Crown III Mine pursuant to paragraph 2 of the agreement. It claimed that the 34.5 KV exception of paragraph 2 did not apply because it could supply the mine without connection to an existing 34.5 KV line. In paragraph 7 of its complaint, RECC claimed a right to serve the mine under the Electric Supplier Act. RECC did not claim any right to serve the mine under paragraph 1 of the service-area agreement until after the case had been marked "heard and taken" and briefing had begun. RECC changed its theory, or at least added an additional ground which it claimed entitled it to provide service, after all the evidence in the case had been heard. We conclude, therefore, that RECC could not "mend its hold" and that RECC's claim of a right to serve the Crown III Mine pursuant to paragraph 1 of the service-area agreement should not have been considered by the trial court.

CIPS maintains that the grandfather clause contained in paragraph 1 is subject to modification by the language of paragraph 2 of the agreement. CIPS argues that the facts presented to the Commission place this case under ,the "transmission voltage" exception contained in paragraph 2 and that the question of who is entitled to serve the Crown III Mine must be determined in accordance with the Electric Supplier Act (Ill. Rev. Stat. 1981, ch. 111⅔, par. 401 *et seq.*).

CIPS'˙ interpretation of the service-area agreement was adopted

by this court in the Crown II litigation. In *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Com.* (1977), 56 Ill. App. 3d 281, 371 N.E.2d 1143, this court discussed the effect of the service-area agreement entered into by RECC and CIPS:

> "The agreement gives each company the right to serve areas in which they are already providing service subject to the following exception:
>
>> '*** [H]owever, whenever the electrical load of a prospective customer in any area outside of incorporated areas is such that its anticipated load during the first year of normal operation will require, as determined in accordance with accepted engineering practices, that the load be supplied through a connection to an/or extension of an existing as of July 2, 1965, line having a voltage of 34.5 KV or higher, the supplier shall be determined under the Electric Supplier Act as appraised July 2, 1965.'
>
> We agree with the ICC that this exception purposely left open the question as to who is entitled to serve any new loads that may locate in any of the parties' respective service areas and which would require line voltage of 34.5 KV or higher. We also concur with CIPS that the investment in a 34.5 KV line is substantial and electrical suppliers would not enter into service-area agreements if by so doing their 34.5 KV or higher voltage lines existing as of July 2, 1965, would be rendered useless as far as providing service from such lines to any such new loads is concerned, unless availability to serve such new loads is left open for determination under the Electric Supplier Act. Therefore, the Electric Supplier Act must be consulted." 56 Ill. App. 3d 281, 282, 371 N.E.2d 1143.

The supreme court later vacated and remanded with directions that the Commission determine whether "accepted engineering practices" would require that the mine's load be supplied through a connection to or extension of a 34.5 KV line in existence on July 2, 1965. (*Rural Electric Convenience Cooperative Co. v. Illinois Commerce Com.* (1979), 75 Ill. 2d 142, 387 N.E.2d 670.) After the remand, the Commission found in favor of CIPS, and the circuit court affirmed the Commission's finding. This court affirmed the circuit court. *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Com.* (1982), 109 Ill. App. 3d 243, 440 N.E.2d 404, *appeal denied* (1983), 92 Ill. 2d 579.

The same service-area agreement is at issue in this case. We therefore hold that our interpretation of the agreement in the earlier

Crown II litigation controls and that the right to serve the Crown III Mine must be decided under the provisions of the Electric Supplier Act.

In its order granting CIPS the right to serve the Crown III Mine, the Commission held that low voltage service, such as that provided Marvin Moore by RECC, was "inadequate to invoke the priority provisions of Section 5 of the Act as to new customers at a location requiring service by a line having a voltage of 34.5 KV or higher," citing this court's opinion in the Crown II case (*Rural Electric Convenience Cooperative Co. v. Illinois Commerce Com.* (1977), 56 Ill. App. 3d 281, 371 N.E.2d 1143). The Commission then determined, after considering the factors listed in section 8 of the Act (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 408), that CIPS should be allowed to serve the Crown III Mine.

RECC contends that since it was providing electric service to a customer at the location of the mine on July 2, 1965, it has a right to serve any new customer at that same location. RECC concedes that, if it does not have a "grandfathered" right, under section 5(a) of the Act (Ill. Rev. Stat. 1981, ch. 111²/₃, par. 405(a)), to serve the mine, then CIPS must prevail as RECC does not claim it is entitled, under section 8 of the Act, to serve the mine.

In the case at bar, RECC was supplying a 372-acre farm leased by Marvin Moore when the Electric Supplier Act was enacted. Moore's demand for power was small; the farm was metered for 15 amp—240 volt service. The Crown III Mine, on the other hand, will require service from 34.5 KV lines and the power demand will be at least 700 times the amount of power required by Marvin Moore. RECC is not equipped to supply that amount of power and would have to contract with WIPCO, a generation and transmission cooperative, to furnish the service.

The facts present in this case are almost identical to the facts before this court in *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Com.* (1977), 56 Ill. App. 3d 281, 371 N.E.2d 1143. This court rejected Rural Electric's claim of the right under section 5(a) to furnish electricity to the Crown II Mine. The court refused to equate the small farming operation previously in existence on the tract now comprising the coal mine and the coal mine as the same customer at the same location within the meaning of section 5(a) of the Act. The court said:

> "The effective date of the Act was July 2, 1965, and Rural Electric claims it was serving the site of the Freeman Coal Mine on section 23 on that date. The only competent evidence

supporting Rural Electric is the testimony of its manager, Roy Goode, who testified that Rural Electric was furnishing the former owner of section 23, a farmer, with electrical service. Even if Rural Electric was in fact furnishing rural and domestic power to the section, we do not conclude that farm buildings served by low voltage distribution lines and a coal mine requiring a 34.5 KV line can be equated as the same customer at the same location under the intent of section 5 of the Electric Supplier Act. (Ill. Rev. Stat. 1975, ch. 111⅔, par. 405.) If such an intent were to be attributed to the Act, it would have the effect of allowing an electrical supplier the absolute right to serve an area in which it was providing minimal service even though the new customer might require service of a completely different magnitude which would be entirely beyond the scope of the minimal supplier." 56 Ill. App. 3d 281, 283, 371 N.E.2d 1143.

On appeal, the supreme court vacated the judgment and remanded on another issue, but specifically declined to express an opinion on the validity of this court's analysis and application of section 5(a).

■ This court's earlier construction of section 5(a) controls in the present case. The service required by a large industrial user, such as a coal mine, is quite far removed from the service required by a small tenant farmer. Under our analysis in the Crown II litigation, the service provided by RECC to Marvin Moore and the proposed service to the Crown III Mine cannot be equated as the same customer at the same location within the intent of section 5 of the Electric Supplier Act.

■ Therefore, we hold that the Commission was correct in its determination that section 5 of the Act does not apply under the facts of the present case and that the right to serve the Crown III Mine must be determined pursuant to section 8 of the Electric Supplier Act. Since RECC concedes that it does not have a right, under section 8 of the Act, to serve the Crown III Mine, we need not pass on the propriety of the Commission's finding that CIPS is entitled to serve the Crown III Mine.

The judgment of the circuit court of Macoupin County reversing the Commission is hereby reversed.

Reversed.

MILLS and GREEN, JJ., concur.