**In re APEX AUTOMOTIVE WARE-HOUSE, L.P. and Whitlock Corporation, Debtors.**

**APEX AUTOMOTIVE WAREHOUSE, L.P., Plaintiff,**

v.

**WSR CORPORATION, Defendant.**

**WSR CORPORATION and R & S/STRAUSS, Counterclaimants,**

v.

**APEX AUTOMOTIVE WAREHOUSE, L.P. and Whitlock Corporation, Counterdefendants.**

Bankruptcy Nos. 96 B 04594, 96 B 04 596. Adv. No. 96 A 1123.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 25, 1997.

Gerald F. Munitz, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, for Plaintiff.

Forrest B. Lammiman, Lord, Bissell & Brook, Chicago, IL, for Defendant.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the motion of defendant WSR Corporation ("WSR") to dismiss the Amended Complaint of Apex Automotive Warehouse, L.P. ("Apex" or the "Debtor"). On or about December 6, 1994, Apex entered into a stock purchase agreement ("SPA") with WSR pursuant to which Apex purchased all of the outstanding stock of The Whitlock Corporation ("stores that sell automotive parts"). On October 5, 1995, Apex filed a complaint (the "Original Complaint") against WSR in the United States District Court for the Northern District of Illinois containing claims regarding the transaction. On February 22, 1996, Apex and Whitlock filed joint voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On October 15, 1996, Apex filed an Amended Complaint in this Court based upon the same transaction as the Original Complaint.

## JURISDICTION AND VENUE

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This matter is a non-core proceeding as defined in 28 U.S.C. § 157(c) except for Count VI of the Amended Complaint which seeks to subordinate WSR's claims against the estate and the resolution of which shall be a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. § 1409(a).

## FACTUAL BACKGROUND

In exchange for Apex's acquisition of the stock of Whitlock, the SPA provided, *inter alia*, that Apex make a payment of $22,410,-466 to WSR at the closing of the transaction. It further provided that WSR was to prepare a balance sheet ("Closing Balance Sheet") to reflect the value of Whitlock as of the closing date of the transaction ("Closing Book Value"). The Closing Balance Sheet was to have been audited by Deloitte & Touche, L.L.P. If the value of Whitlock was less than $20,810,466, the Stock Purchase Agreement obligated WSR to make a post-closing adjustment and to refund to Apex the difference between the Closing Book Value and $20,810,466.

On January 27, 1995, the transaction closed and Apex made the payment of $22,-410,466 to WSR. By a series of amendments to the SPA, Apex gave WSR until September 22, 1995 to prepare and deliver the Closing Balance Sheet. WSR delivered several different unaudited closing balance sheets for Whitlock. Apex alleges in its Amended Complaint that an audited Closing Balance Sheet would have resulted in a Closing Book Value at least $6,200,000 less than $20,810,-466. Since the closing date, Apex alleges, WSR has paid only $1,000,000 to Apex in post-closing adjustments.

The parties also entered into a consulting agreement (the "Consulting Agreement"), dated January 27, 1995. In connection with this agreement, Apex paid WSR $1,500,000 in exchange for which WSR agreed "to advise, counsel, and consult with Apex with respect to relationships with employees, landlords, suppliers and customers of the Business, purchasing, computerization of the Business' in-ventory and the overall operations of the Business and to perform such other services relating to the Business as agreed upon by Apex and [WSR]."

The term of the agreement is described as January 27, 1995 through April 27, 1995. The parties acknowledge later in the agreement however that WSR had, as of the date of the Consulting Agreement, already substantially performed its obligations.

## THE PLEADINGS

The Amended Complaint contains six Counts. In Count I, Apex alleges that WSR failed to prepare and deliver to Apex an audited closing balance sheet and to make the post-closing adjustment payment. In Count II, Apex claims that WSR made representations in the SPA regarding the value of Whitlock that were false. In Count III, Apex claims that during the negotiations of the SPA, WSR provided false, misleading financial information to Apex, in order to induce Apex to pay an inflated amount for Whitlock. Apex also claims that WSR continued to provide erroneous financial information to Apex after the closing in order to minimize the post-closing payment. Apex alleges further that it relied on the misrepresentations to its detriment.

In Count IV, Apex claims that WSR breached the Consulting Agreement by failing to perform its obligations. In Count V, Apex pleads that it received no consideration for its obligations under the Consulting Agreement, that the Consulting Agreement is not an enforceable contract and that WSR has been unjustly enriched by its retention of the $1,500,000 paid to it by Apex. Finally, in Count VI, Apex requests that WSR's claims, as a creditor in the bankruptcy case, be equitably subordinated, pursuant to 11 U.S.C. § 510(c), because its conduct relating to the sale of Whitlock was fraudulent and inequitable, causing damage to Apex and its other creditors.

## THE MOTION TO DISMISS

■ WSR has moved to dismiss the Amended Complaint on several grounds. First, WSR asserts that the Amended Com-

plaint is an impermissible attempt by Apex to "mend the hold." "Mend the hold" is a nineteenth century wrestling term meaning to get a better grip or hold on your opponent. The term has come to indicate a common law doctrine that limits the right of a party to a contract suit to change his litigating position. *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362 (7th Cir.1990). WSR claims that Apex has done just that in every Count of its Amended Complaint by contradicting admissions and concessions allegedly made in the Original Complaint and raising new allegations.

In addition, WSR asserts that Apex has failed to state a claim for fraud in Count III of the Amended Complaint. It argues that the fraud claim alleges facts which occurred after the closing of the sale, and is therefore an impermissible attempt to convert a contract dispute into a fraud claim. WSR also argues that Apex's fraud allegations do not meet the particularity standard of Fed. R.Civ.P. 9(b), which applies in adversary proceedings by virtue of Bankruptcy Rule 7009.

Finally, WSR claims that Apex has failed to state a claim arising from the Consulting Agreement. It argues that the Consulting Agreement has been substantially performed, and that Count IV of the Amended Complaint should therefore be dismissed. WSR also argues that a claim for unjust enrichment cannot stand when there is a contract between the parties, so that Count V should be dismissed.

### DISCUSSION

#### Standards for a Motion to Dismiss

Generally, for a defendant to prevail on its motion to dismiss, it must appear from the complaint that the plaintiff can prove no set of facts which could entitle it to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir.1987), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987). The court must assume the truth of all well-pleaded factual allegations and make all possible inferences in favor of the plaintiff. *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991). The plaintiff need not demonstrate that it will ultimately

prevail, only that it has pleaded a claim sufficient to entitle it to go forward with the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Nevertheless, the plaintiff must give the defendants fair notice of its claims and the grounds for those claims. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993) and *Conley v. Gibson*, 355 U.S. at 47, 78 S.Ct. at 102–03.

#### "Mend the Hold"

Initially, WSR argues that the Amended Complaint in its entirety constitutes an impermissible attempt to "mend the hold" of the claims contained in the Original Complaint.

In the Original Complaint, Apex pleaded four Counts based on the SPA and WSR's calculation of the Closing Book Value for the purpose of making the post-closing adjustment. First, it claimed that WSR refused to properly calculate the "gross inventory" of Whitlock in accordance with the terms of the SPA. In Count II, it alleged that WSR did not properly use Whitlock's accounts payable in the calculation of the Closing Book Value. In Count III, Apex alleged that WSR failed to use current liabilities for warranties and returns in calculating the Closing Book Value, as required by the SPA. Finally, in Count IV, Apex claimed that WSR did not properly calculate the inventory obsolescence reserve, which was to be used to calculate the Closing Book Value.

■ Illinois law prohibits a party to a contract from "hok[ing] up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tr[ying] on another defense for size ..." The "mend the hold" doctrine is a "corollary of the duty of good faith that the law of Illinois ... imposes on the parties to contracts." *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (7th Cir.1990).

In the opinion that coined the term "mend the hold", *Railway Company v. McCarthy*, 96 U.S. 258, 24 L.Ed. 693 (1877), the defendant railroad sought to present a new argu-

ment on appeal to justify its inability to ship the plaintiff's cattle on a particular Sunday. It had pleaded and presented evidence at trial that it did not have sufficient cars to make the shipment until the following Monday. It was only on appeal that it sought to argue that the "Sunday law" of West Virginia would have made shipping the cattle illegal. Under these circumstances, the Court estopped the railroad from "mending its hold".

Since that early decision, courts have struggled with the fact that the doctrine clashes with liberal federal and state pleading rules. *See, e.g., Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d at 362–365 and *IK Corp. v. One Financial Place Partnership,* 200 Ill.App.3d 802, 815, 146 Ill.Dec. 198, 207, 558 N.E.2d 161, 170 (1st Dist.1990). The Seventh Circuit opined that the reach of the doctrine is uncertain, particularly as it contradicts Rule 8(e)(2), which permits a party to state as many claims as the party has without regard to consistency. *Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d at 364. The Court specifically found that, unlike here, it did not need, in that case, "to determine ... whether it precludes alternative pleading from the outset ...", *Harbor Insurance Co. v. Continental Bank Corp.,* 922 F.2d at 357.

 Under Fed.R.Civ.P. 15 (applicable to adversary proceedings via Bankruptcy Rule 7015), amendments may be made as of right, and when permission is required that permission is to be freely given. Pleadings may even be amended during trial to conform to the evidence presented unless prejudice can be demonstrated. The "mend the hold" doctrine appears to contradict these liberal pleading rules directly if applied at this stage of litigation.

It is instructive to examine some of the Illinois cases applying the "mend the hold" doctrine upon which WSR relies. In *Larson v. Johnson,* 1 Ill.App.2d 36, 116 N.E.2d 187 (1953), the plaintiff sought specific performance of a contract for the purchase of the defendants' interest in an apartment building in Chicago. The defendants pleaded a single defense in their answer, that the execution of the contract was obtained by fraud and misrepresentations. In a cross-complaint they made the same allegations, seeking an order rescinding the contract on the grounds that it was fraudulently obtained. The case was referred to a special master who heard the evidence and found for the plaintiff on the issue of fraud. The special master did not recommend awarding specific performance to the plaintiff, however, on the ground that a term in the contract was too vague to be enforced. On appeal, the defendants argued the vagueness issue. The appellate court rejected this shift in position as an attempt to "mend the hold." Having failed to win the case on the only defense pleaded, the court found that it would be inequitable to allow the defendants to alter their position on appeal. For this and other reasons, the court reversed and remanded the case for further proceedings.

More recently, in *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Comm.,* 118 Ill.App.3d 647, 73 Ill.Dec. 951, 454 N.E.2d 1200 (4th Dist.1983), the RECC did not claim a particular right under its agreement with the Central Illinois Public Service Co. until all of the evidence in an administrative hearing had been heard. As in *Larson,* the appellate court concluded that allowing the RECC to "mend its hold" well into the litigation was inequitable and decided that the RECC's new claim should not have been considered by the trial court.

Then, in *IK Corp. v. One Financial Place Partnership,* 200 Ill.App.3d 802, 146 Ill.Dec. 198, 558 N.E.2d 161 (1st Dist.1990), a prospective tenant brought an action against a prospective lessor for specific performance of a lease, *inter alia.* Several draft leases had been prepared, although none had been executed. Eventually, the tenant who was already in the subject space informed the lessor that its needs had changed and it would not be vacating the space. The plaintiff IK Corp. was therefore unable to obtain the lease it desired. IK Corp. argued, *inter alia,* that the lessor originally excused its refusal to execute the lease by stating that the current tenant was retaining its lease but raised a different defense when IK Corp.'s attorney asserted its claim to the subject premises. The court rejected this argument because this was "not a case where a party has

switched his position at trial." *Id.* at 815, 146 Ill.Dec. 198, 558 N.E.2d at 170.

In *Larson v. Johnson* and *Rural Electric Convenience Cooperative Co. v. Illinois Commerce Comm.*, the courts applied the "mend the hold" doctrine to preclude parties from raising new defenses at trial or on appeal when a change in position would have significantly prejudiced the other party which had been applying its resources to litigating the case on the defense originally asserted. In *IK Corp. v. One Financial Place Partnership*, the court refused to apply the doctrine because the defendant had altered his position prior to the litigation and had not waited until trial. The situation presented here is more like *IK Corp.* than the earlier cases. Apex has amended its complaint and added new claims after filing for bankruptcy and reexamining the financials of the company that it recently acquired. WSR now has more serious claims to contend with, but otherwise has suffered no prejudice as a result of the amendment.

It is even less clear why WSR relies on the Seventh Circuit cases visiting this issue. In *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007 (7th Cir. 1985), the Court rejected a "mend the hold" argument to find that there was no requirement that the defendant had to assert its defense at the time of the actual breach. The defendant was permitted to raise a defense in its Answer to the First Amended Complaint that it had not raised in its letters terminating the subject contract.[1]

Most recently, in *Horwitz–Matthews, Inc. v. City of Chicago*, 78 F.3d 1248 (7th Cir. 1996), the City of Chicago explicitly and repeatedly stated during the course of litigation that it did not consider a repealing ordinance to be a defense to a breach of contract suit. The Court opined that the City would be bound by such a concession in the future. In coming to its determination, the court held that "[u]nder the doctrine of 'mend the hold,' in force in Illinois, a party to a contract cannot, *at least after the pleadings are com-*

*plete*, repudiate a position taken in the course of litigation over the contract." *Id.* at 1251 (emphasis supplied). The Court specifically excluded the pleading process from application of this doctrine.

The Seventh Circuit case with the most detailed discussion of this doctrine is *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357. There, insurers brought a declaratory judgment action seeking a declaration that they were not liable under a directors' liability policy, for claims asserted against bank directors for securities fraud. In their complaint, the insurers claimed that the behavior of the directors had been so egregious that it did not have to indemnify the bank. The bank settled the securities claims and filed a counterclaim against the insurers for the settlement amount. In response to the counterclaim, the insurer argued that the bank had settled the case prematurely because the directors had not been guilty of any misconduct at all. When the counterclaim was tried, the bank sought to introduce the insurer's declaratory judgment complaint into evidence to show that the bank had acted appropriately in settling the lawsuit. The trial court denied the request. On appeal, the Seventh Circuit found the ruling incorrect on two grounds, one of which was that the insurer should not have been permitted to "mend the hold".

While instructive on the history of the doctrine and its applicability to federal cases applying Illinois law, the *Harbor Ins. Co. v. Continental Bank Corp.* opinion is not dispositive of the question before this court. There, the court was presented with the egregious situation of an insurer trying to take opposite positions in order to avoid liability and then attempting to hide its duplicity from the jury. Here, the court is presented with a party who has amended its complaint to add some claims, a very different situation.

---

1. An Illinois court came to the same conclusion when a party articulated an excuse for refusing to perform under a loan agreement for the first time during litigation. No excuse had been provided at the time of the termination of the agreement. In this case cited by WSR, the opposing party's "mend the hold" argument was rejected. *Israel v. Nat'l Canada Corp.*, 276 Ill.App.3d 454, 213 Ill.Dec. 163, 658 N.E.2d 1184 (1st Dist. 1995).

554

The common thread that runs through all of this case law is a concern for the prejudice suffered by one party as a result of a significant shift in position by another party well into litigation. This court concludes that this doctrine should not be applied at the pleading stage of a litigation. The Federal Rules of Civil Procedure are designed to encourage the emergence of truth by allowing parties to plead alternatively, to amend freely and to develop their legal positions as the facts emerge during discovery. To freeze the parties' positions before issue has even been joined cuts strongly against the design of the Federal Rules to encourage the emergence of the truth.

WSR's strenuous argument that "mend the hold" is a substantive Illinois rule with no consideration for procedural pleading rules is without support. Contrary to WSR's assertions, the Seventh Circuit has not concluded that the doctrine is strictly substantive. The court has communicated serious concern that this doctrine not be used to "freeze parties in the positions they take in their initial pleadings" and has concluded that the doctrine's reach is "uncertain." The court pointedly has not determined "the doctrine's outer bounds". *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d at 364. *See also Cleveland Hair Clinic v. Puig*, 947 F.Supp. 359, 363 n. 10 (N.D.Ill.1996).

WSR also vehemently argues that the doctrine is designed to bind parties to their initial reasons for the dispute and that it does not matter at what point the change occurs. Counsel cites to *Schuyler Co. v. Missouri Bridge & Iron Co.*, 256 Ill. 348, 100 N.E. 239 (1912) as an example of a case where a party was held to a position enunciated prior to the commencement of the litigation. In *Schuyler Co.*, a party was precluded from varying its position during trial from the position it had declared in a pre-litigation letter and in its pleading. The court opined that "[w]here a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, *after litigation has begun*, change his ground, and put his conduct upon another and different consideration." *Id.* at 352, 100 N.E. at 240 (emphasis supplied). *Schuyler Co.* does not support the

proposition for which WSR cites it. *Schuyler* is an example of how it matters greatly at what point the change occurs. The affected party in *Schuyler* was not permitted to change at trial a position it had taken prior to litigation and in its pleadings. The court specifically singled out changes of position that occur after the litigation has begun. The opinion does not address the question presented here of whether a party is precluded by this doctrine from amending his pleading. Unfortunately, this mischaracterization of legal authority was a consistent problem throughout WSR's briefs.

Even if this court were inclined to apply the doctrine substantively at this preliminary stage, WSR's arguments for applying the "mend the hold" doctrine are unpersuasive. First, WSR argues that the Original Complaint contains admissions regarding the Closing Balance Sheet that the Amended Complaint contradicts. The supposed "admissions" that WSR cites are not admissions at all. WSR states that the Original Complaint concedes that Deloitte & Touche did not, could not and/or refused to perform an audit in accordance with the SPA. This is hardly an admission that WSR is not responsible for failing to deliver the Closing Balance Sheet. WSR also argues that the Original Complaint states that Apex and WSR disagreed over the proper calculation of some of the items necessary to determine the Closing Book Value. Again, this is not an admission. A close examination of the pleadings does not reveal the kind of reversal of position evident in the cases cited by WSR.

Second, WSR argues that the fraud count must be dismissed because the "mend the hold" doctrine does not permit a contracting party to admit the validity of an express contract and simultaneously attack its enforceability. Fed.R.Civ.P. specifically allows alternative pleading. Rule 8(a) and (e). Moreover, Illinois permits the prosecution of causes of action for breach of contract together with fraud in the inducement. *Johnson v. George J. Ball, Inc.*, 248 Ill.App.3d 859, 187 Ill.Dec. 634, 617 N.E.2d 1355 (2nd Dist.1993); *Vance Pearson, Inc. v. Alexander*, 86 Ill.App.3d 1105, 42 Ill.Dec. 204, 408

N.E.2d 782 (4th Dist.1980). Apex has alleged that WSR engaged in a fraudulent scheme to cause it to enter into the SPA and to pay an inflated price for Whitlock that did not reflect its actual value. This is a properly pleaded claim for fraud in the inducement. Apex then alleges that WSR did certain acts which breached its obligations under the SPA. This is a properly pleaded claim for breach of contract and these claims do not contradict each other.

 Third, WSR insists that Apex be held to its original contractual defense that this dispute is fundamentally about post-closing price adjustments. As discussed, *supra*, this Court will not prevent a party from amending its complaint and expanding upon its claims when there is no prejudice to the other side. Moreover, the additional allegations of fraud do not constitute a reversal or seismic shift in Apex's original position as in many of the "mend the hold" cases.

Finally, WSR argues that Apex should not be permitted to make new allegations that WSR breached the Consulting Agreement. There is simply no authority for such a pleading restriction.

Therefore, the motion to dismiss the Amended Complaint on the ground that it violates the "mend the hold" doctrine is denied.

### The Fraud Claim

WSR argues that Apex's fraud claim should be dismissed on two grounds. First, it claims that Apex fails to allege the elements of a fraud claim. Second, it asserts that Apex has failed to meet the particularity requirement.

 Under Illinois law, the elements of fraud are as follows:

(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance.

*Indemnified Capital Investments, S.A. v. R.J. O'Brien & Assoc., Inc.,* 12 F.3d 1406, 1412 (7th Cir.1993). Apex alleges in Count III of its Amended Complaint that during the negotiations of the SPA, WSR knowingly provided false and misleading financial information about Whitlock to Apex. Apex alleges that it reasonably relied on this information to its detriment resulting in its insolvency. This states a cause of action for fraud. WSR's argument that Apex's fraud claim consists primarily of allegations relating to post-closing representations is not borne out by a review of the pleadings.

 Further, the claim is sufficiently particular to meet the standards of Rule 9(b). The Seventh Circuit requires a plaintiff to state "'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.' [Citations omitted]. In other words, the plaintiff must plead the 'who, what, when and where of the alleged fraud.'" *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). Rule 9(b) does not, however, require a plaintiff to plead the evidence that, if true, would show that the defendant's alleged misrepresentations were indeed false. *Katz v. Household International, Inc.,* 36 F.3d 670, 675 (7th Cir.1994); *Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 524 (7th Cir.1993); *Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923; *Sequel Capital Corp. v. Airship International Ltd.,* 148 F.R.D. 217, 219 (N.D.Ill.1993).

In paragraph 22 of its Amended Complaint, Apex alleges that WSR made the following false representations.

In Schedule 2.4(c) to the SPA, WSR represented that the Closing Book Value of Whitlock as of September 3, 1994 was $20,-810,466, which did not accurately describe the value of Whitlock.

In Schedule 3.7 to the SPA, WSR provided a balance sheet of Whitlock as of September 3, 1994, indicating that Whitlock had equity of $21,713,000 and profit and loss statements for each of the stores that Whitlock owned at the closing. The information did not accurately describe Whitlock's value, Whitlock's equity or the profits and losses for the stores.

In the SPA, WSR represented that "since September 3, 1994, there has been no material adverse change in the properties, business, operations or financial condition of the company." This representation was false because the stores had suffered a substantial reduction in sales volume from September 3, 1994 through January 27, 1995.

In the SPA, WSR represented that from September 3, 1994 until the closing, Whitlock had not "conducted its business in a manner other than consistent with past management practices and in substantially the same manner as theretofore conducted." This representation was false because the business had been conducted in a manner that improperly inflated the Closing Book Value, including overstating its inventory.

The SPA was misleading because WSR caused Whitlock management to deliberately leave stores open that Whitlock's management believed should have been closed for the sole purpose of inflating the apparent value of Whitlock.

These allegations provide the who, what, when and where of the alleged fraud. They are sufficiently particular to meet the requirement of Rule 9(b) and the motion to dismiss the fraud claim is denied.

### The Consulting Agreement

■ WSR advances two arguments regarding Apex's claims pertaining to the Consulting Agreement. First, WSR seeks dismissal of Count IV, which alleges that WSR failed to perform its obligations under the agreement. WSR relies on the statement in the Consulting Agreement that it was substantially performed as of the date of the agreement to argue that WSR therefore could not have breached the agreement. WSR then takes this argument a step further, stating that although the Consulting Agreement contemplates additional services, those services were to be rendered on an as needed basis by mutual agreement of the parties. Because Apex did not allege an additional mutual agreement of the parties, WSR argues that no claim has been stated.

■ In order to plead a cause of action for breach of contract, the plaintiff must allege that there is a contract, that the plaintiff performed its obligations thereunder, that the defendant breached the contract and that the plaintiff was damaged as a result. *Talbert v. Home Savings of America, F.A.*, 265 Ill.App.3d 376, 379, 202 Ill.Dec. 708, 711, 638 N.E.2d 354, 357 (1st Dist.1994); *OnTap Premium Quality Waters, Inc. v. Bank of Northern Illinois, N.A.*, 262 Ill.App.3d 254, 258–259, 199 Ill.Dec. 586, 590, 634 N.E.2d 425, 429 (2nd Dist.1994).

Count IV states a straightforward breach of contract claim. Apex alleges the existence of the contract, that it performed by paying WSR $1,500,000 at the closing, that WSR failed to perform its obligations to assist Apex with the running of Whitlock and that that failure contributed to the insolvency of Apex and Whitlock. Although WSR is correct that the parties agreed that WSR had, as of the date of the Consulting Agreement, already substantially performed its obligations, the term of the agreement is described as January 27, 1995 (the date of the agreement) through April 27, 1995. The agreement contemplates services being performed during its term. Any ambiguity regarding the parties' obligations raises a factual issue which will not be resolved on this motion.

■ WSR also seeks dismissal of Count V in which Apex pleads a claim for unjust enrichment, claiming that the Consulting Agreement was without consideration and is unenforceable. This Count does not state a cause of action. A request for an equitable remedy is not appropriate where there is no doubt as to the existence of a contract between the parties concerning the same subject matter. Only where the existence of the contract is at issue may a party plead alternatively for recovery under the contract and recovery on equitable grounds such as unjust enrichment, quantum meruit or promissory estoppel. *See Prentice v. UDC Advisory Services, Inc.*, 271 Ill.App.3d 505, 207 Ill.Dec. 690, 648 N.E.2d 146 (1st Dist.1995)(where recovery under promissory estoppel theory not permitted once it was established that there was contract between

parties); *Concord Industries, Inc. v. Harvel Industries Corp.,* 122 Ill.App.3d 845, 78 Ill. Dec. 898, 462 N.E.2d 1252 (1st Dist. 1984)(where existence of oral contract at issue so plaintiff could also plead cause of action for quantum meruit). Simply put, a claim for unjust enrichment cannot stand where an express contractual agreement exists between the parties. *People ex rel. Hartigan v. E & E Hauling, Inc.,* 218 Ill.App.3d 28, 160 Ill.Dec. 691, 702, 577 N.E.2d 1262, 1273 (1st Dist.1991), *modified,* 153 Ill.2d 473, 180 Ill.Dec. 271, 607 N.E.2d 165 (1992).

A copy of the Consulting Agreement was annexed to the Amended Complaint, complete with the signatures of both parties. The agreement itself provides for both parties to perform certain obligations. If WSR failed to perform its obligations, it may be liable to Apex for breach of the agreement. There is no doubt, however, as to the existence of the agreement. Therefore, WSR's motion to dismiss Count V is granted.

### CONCLUSION

For all of the above reasons, WSR's motion to dismiss the Amended Complaint is denied except as to Count V, which is dismissed with prejudice.

### ORDER

Based on the Memorandum Opinion dated February 25, 1997, **IT IS HEREBY ORDERED THAT** WSR's motion to dismiss the Amended Complaint of Apex Automotive Warehouse, L.P. is denied except as to Count V, which is dismissed with prejudice. WSR shall serve its answer to the Amended Complaint on or before March 14, 1997. This matter is set down for a status conference on March 26, 1997 at 10:30 a.m.